IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| RYAN C. SALAZAR, <br> Institutional ID No. 173119, <br><br> Plaintiff, <br><br> v. <br><br> UNKNOWN POLICE DOG <br> HANDLER (K-9), *et al.*, <br><br> Defendants. | § § § § § § § § § § § § | CIVIL ACTION NO. 5:23-CV-054-BQ |

**FINDINGS, CONCLUSIONS, AND**
**RECOMMENDATION AND ORDER OF TRANSFER**

Pro se Plaintiff Ryan C. Salazar alleges that Defendant Corporal Stephen Hastings, a Lubbock County Sheriff's Office (LCSO) K9 handler, used excessive force based on (1) the decision to release his K9, and (2) the duration of the dog's bite. 2d Am. Compl. 4–5, ECF No. 22.[1] Salazar also contends that Defendants LCSO Sergeant Joshua Cisneros, Sergeant Samuel Delarosa, Deputy Joseph Jaramillo, Cole Lidiak, Jordan Uptain, Tracey Siegfried, Gregory Treharne, and Michael Macias failed to intervene and stop Defendant Hastings' purported use of excessive force. *Id.* at 3.

The Honorable James Wesley Hendrix, United States District Judge, transferred this case to the undersigned United States Magistrate Judge, and in accordance with the order's directive, the undersigned conducted preliminary screening as described in 28 U.S.C. § 1915A(b). ECF Nos. 5, 8, 32, 33, 34, 63. The undersigned determined that Salazar's claims against Defendants in their individual capacities survive preliminary screening. ECF Nos. 34, 63. Consequently, the Court

---

[1] Page citations to Salazar's Second Amended Complaint refer to the electronic page number assigned by the Court's electronic filing system.

entered an order requiring Defendants to answer or otherwise plead to Salazar's claims. ECF Nos. 63, 80. Defendants timely filed Answers. ECF Nos. 72, 75, 78, 94.

As of today's date, not all parties have consented to jurisdiction by the magistrate judge. Upon review of Defendants' Answers, it is the opinion of the undersigned that this matter must be transferred to the district judge for further proceedings.

## I. Discussion

The undersigned previously found that Salazar's claim for excessive force against Defendant Hastings in his individual capacity as to the deployment of his K9, Arlo, as well as the duration of Arlo's bite, survives preliminary screening. ECF No. 63, at 3–8. The Court also determined Salazar's bystander liability claim against Defendants Cisneros, Delarosa, Jaramillo, Lidiak, Uptain, Siegfried, Treharne, and Macias survives.[2] *Id.* The Court discusses each claim below.

### A. Excessive Force

Salazar's use of force claim arises under the Fourth Amendment because he allegedly sustained injuries when officers effectuated his arrest.[3] *See* 2d Am. Compl. 4–6; *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Today we make explicit what [has been] implicit . . . and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in

---

[2] The Court concluded that all of Salazar's other 42 U.S.C. § 1983 claims failed to state a claim for relief and dismissed them. *See* ECF No. 34.

[3] The Court finds the Fourth Amendment applies to Salazar's claim regarding the duration of Arlo's bite, despite Salazar's apparent seizure and restraint at the time of the bite. *See, e.g., Brothers v. Klevenhagen*, 28 F.3d 452, 457 (5th Cir. 1994) ("Once an individual has been arrested and is placed into police custody, and surely after the arresting officer has transferred the individual to a jail cell, the individual becomes a pretrial detainee, protected against excessive force by the" Fourteenth Amendment.); *Valencia v. Wiggins*, 981 F.2d 1440, 1443–44 (5th Cir. 1993) (explaining that "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time," the Fourth Amendment no longer applies); *Alanis v. City of Brownsville*, No. 1:16-cv-190, 2018 WL 11183788, at *6–7 (S.D. Tex. June 7, 2018) (concluding Fourth Amendment applied, where at time of plaintiff's excessive force claim "incidents of arrest" were not complete, plaintiff "had not yet been released from the arresting officers' custody," and plaintiff was not yet fully in detention), *R. & R. adopted by* 2018 WL 11183821 (S.D. Tex. July 24, 2018).

the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard . . . ." (internal quotation marks omitted)); *Est. of Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021) ("The Fourth Amendment provides protections against an officer's use of excessive force to effect an arrest or other seizure.").

To sufficiently state an excessive force claim, an arrestee must demonstrate that he suffered "(1) an injury, (2) that resulted directly from an officer's use of force, and (3) that the force used was objectively unreasonable." *Aguirre*, 995 F.3d at 406 (internal quotation marks and citation omitted). "The second and third elements collapse into a single objective-reasonableness inquiry, guided by" a non-exclusive list of considerations known as the *Graham* factors. *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (internal citation omitted); *see Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) ("The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible."). The *Graham* factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Peña*, 879 F.3d at 619 (quoting *Graham*, 490 U.S. at 396).

Salazar contends that on February 15, 2023, "all [D]efendants forced entry into [his] grandmothers/uncles [sic all] home" to serve "one year old warrants," including at least two felony warrants for evading arrest with a vehicle and unauthorized use of a motor vehicle. 2d Am. Compl. 4; *see* Tr. 23:19–24:17, ECF No. 67.[4] Prior to the officers' arrival, Salazar avers that he had consumed two pints of liquor and came outside to speak with someone in a vehicle stopped in front

---

[4] Citations to the transcript reference the Court's *Spears* hearing held July 6, 2023.

3

of the home. Tr. 6:2–20. According to Salazar, he then returned to the house and passed out in a car in the garage.[5] *Id.* The authenticated records show that officers were surveilling Salazar and, after he re-entered the home, they surrounded it and called for him to come out, using sirens and a public address system. *See, e.g.*, Uptain BWC 0:00–22:05.[6] Because Salazar did not respond, SWAT officers eventually assembled inside an armored vehicle, made numerous additional calls for Salazar to exit the home, breached the front door using a battering ram mounted to the front of the vehicle, continued calling for Salazar, and eventually entered the home in an attempt to find him. *See, e.g.*, Williams BWC 00:00–29:18;[7] Daniel BWC 0:00–12:00.[8]

Predictably, the Court is presented with two versions of what happened next. Video footage provided by Lubbock County, however, plainly refutes some of Salazar's claims. The Court therefore re-constructs his factual assertions to reflect a timeline consisting of his allegations *except* where clearly contradicted by video or audio evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the district court did not have to accept the plaintiff's description of his driving where it was "blatantly contradicted by" video from the police car's dash cam); *Boyd v. McNamara*, 74 F.4th 662, 666 (5th Cir. 2023) ("Because video evidence is available, we are required to 'view the facts in the light depicted by the videotape.'" (citation omitted)).

When officers did not find Salazar in the home, they moved to the garage. *See, e.g.*, Treharne BWC 00:00–14:00.[9] Defendant Hastings first sent Arlo into the garage. Hastings BWC

---

[5] The authenticated records indicate that as Salazar spoke to the individual, officers started to approach and serve the warrants but Salazar re-entered the house. Salazar denies seeing the officers and states he merely went into the garage and passed out in the "car's back seat-ish." Tr. 5:17–6:25.

[6] "BWC" stands for body-worn camera.

[7] File ends in "10047338."

[8] File ends in "221815070."

[9] File ends in "37856992."

56:10–57:15.[10] When Arlo did not find Salazar, officers entered the garage, yelled for Salazar to come out, and warned him that if he did not show himself, they would use gas and a dog to extract him.[11] *See, e.g.*, Macias BWC 29:10–30:30. Staff Sergeant Macias then entered and began searching a car parked in the garage. Macias BWC 30:40–:31:35. He tried to fold down the backseat on the driver's side, but something was "giving resistance." *Id.* Defendant Macias went around to the other side of the vehicle, and he and/or Defendant Treharne successfully unlatched the seat, folding it down to reveal the trunk. *Id.*; Treharne BWC 16:00–:15. Upon discovering Salazar in the trunk, Defendant Treharne yelled, "Let me see your f***ing hands, don't f***ing move!" Treharne BWC 16:00–:15. Another officer shouted "bring that f***ing dog in here right now" and also cautioned Salazar that they would send the dog in to retrieve Salazar. Treharne BWC 16:00–:29; Macias BWC 30:40–:31:35; Hastings BWC 1:00:50–:55. Defendant Treharne again ordered Salazar to show his hands and then cautioned him that if he did not come out, they would send the dog into the trunk. Treharne BWC 16:10–:29.

Salazar alleges it was at this point that he awoke. *See* Tr. 7:8–10:13 (contending that he woke up to officers standing over him yelling, "Let me see your hands!"). Salazar was in the trunk of the vehicle laying on his side with his head towards the driver's side. *Id.* He asserts that he immediately placed his hands in the air, though the video shows he did not emerge from the trunk as ordered. *Id.*; *see* Treharne BWC 16:10–:29; Hastings BWC 1:00:50–:01:25. Defendant Hastings sent Arlo into the vehicle to retrieve Salazar, but Arlo was initially unsuccessful and exited the vehicle. Hastings BWC 1:00:55–1:01:30. An officer warned Salazar that he would put the dog back in the car unless Salazar crawled out of the trunk. Hastings BWC 1:01:25–:33;

---

[10] File ends in "11480476."

[11] At first, the officers believed Salazar was in the garage's attic. *See, e.g.*, Treharne BWC 14:15–15:25.

5

Macias BWC 32:00–:16. The officer told Salazar this was his "last warning." Hastings BWC 1:01:25–:33; Macias BWC 32:00–:16. Another officer then said, "come to me, Chino."[12] Hastings BWC 1:01:33–:43; Macias BWC 32:16–:25. When Salazar still refused to get out, Defendant Hastings placed Arlo back in the vehicle; Arlo did not engage so Defendant Hastings pulled Arlo out and immediately placed him back in the vehicle. Hastings BWC 1:01:43–:02:02. The third time, Arlo bit Salazar's left forearm/elbow area. Hastings BWC 1:02:02–:03:26.

Salazar reacted by saying, "okay, okay, okay," and Defendant Hastings repeatedly ordered Salazar to "come out" and "bring me my dog." *Id.* Other officers also yelled for Salazar to get out of the trunk and cautioned him that Arlo would keep biting until Salazar crawled out.[13] *Id.*; Macias BWC 32:45–33:20. After almost thirty seconds, Salazar began slowly emerging from the trunk, and officers pulled him and Arlo (who remained attached to Salazar's arm) from the vehicle to the ground. Hastings BWC 1:02:02–:03:26. Approximately forty-three seconds after that, Defendant Macias managed to apply the right handcuff, and Defendant Hastings detached Arlo from Salazar's arm so that Macias could apply the left. *Id.*; Macias BWC 33:26–34:15; Treharne BWC 18:05–:48. The video reflects that, in total, Arlo bit Salazar around one minute and twenty seconds, though Arlo may have released and reattached at some point during the encounter. Hastings BWC 1:02:02–:03:26; *see* Tr. 10:19–11:16 (testifying that Arlo bit, released, and bit again). Defendant Hastings maintained Arlo on leash almost the entire bite. Hastings BWC 1:02:02–:03:26.

As a result of Arlo's bite, Salazar asserts he underwent surgery to treat lacerations, deep puncture wounds, and a ripped tendon, and he received "20-30 [sutures]." 2d Am. Compl. 6; Tr.

---

[12] "Chino" is apparently Salazar's alias. 2d Am. Compl. 4.

[13] Salazar maintains that the officers did not order him out of the vehicle, nor did they warn him that they would deploy Arlo. *See* 2d Am. Compl. 4; Tr. 8:14–10:18. The videos, as discussed herein, clearly refute these allegations.

14:25–15:13. He also contends his left arm no longer functions the same, is deformed (looks like a "double elbow"), has a two inch scar, and has permanent nerve damage. 2d Am. Compl. 6; Tr. Tr. 14:25–15:13. Overall, Salazar avers he suffers psychological trauma from the February 15 incident. Tr. 34:21–35:3; *see* 2d Am. Compl. 3.

### 1. *Defendant Hastings' decision to release Arlo*

Salazar acknowledges that Defendants entered his family's home to serve at least two felony warrants for evading arrest with a vehicle and unauthorized use of a motor vehicle—serious offenses. 2d Am. Compl. 4; *see* Tr. 23:19–24:17. This fact weighs in Defendant Hastings' favor. *See, e.g., Hinson v. Martin*, 853 F. App'x 926, 931 (5th Cir. 2021) (per curiam) (concluding first *Graham* factor favored defendant where plaintiff had outstanding felony warrant for armed robbery); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." (compiling cases)). Salazar contends, however, that when Defendants discovered him sleeping in the vehicle's trunk, he immediately put his hands in the air (though the video shows he did not emerge from the trunk as ordered). Tr. 7:8–10:13; Treharne BWC 16:10–:29; Hastings BWC 1:00:50–:01:25. Defendant Hastings then sent Arlo into the vehicle to retrieve Salazar, but Arlo was initially unsuccessful and exited the vehicle. Hastings BWC 1:00:55–1:01:30. After several warnings, Defendant Hastings placed Arlo back in the vehicle; Arlo did not engage so Defendant Hastings pulled Arlo out and immediately placed him back in the vehicle. Hastings BWC 1:01:43–:02:02. The third time, Arlo bit Salazar's left forearm/elbow area. Hastings BWC 1:02:02–:03:26.

The Court finds Salazar's factual assertions, in conjunction with the video footage, require that his claim proceed. Salazar did not attempt to flee once discovered (he could not have done so

7

under the circumstances) and allegedly placed his hands in the air as directed. *See Betts v. Brennan*, 22 F.4th 577, 583 (5th Cir. 2022) (explaining that "the line between active and passive resistance is sometimes hazy and" is a fact-intensive inquiry). And from the time the officers first discovered Salazar until Arlo's bite, approximately only seventy-five seconds elapsed.[14] Treharne BWC 16:12–17:28.

Because of the fact-intensive nature of the inquiry, the Court cannot conclude at screening, as a matter of law, that the *degree of force* applied by Defendants was reasonable under the circumstances, assuming Salazar had his hands raised. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) ("Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" (quoting *Graham*, 490 U.S. at 396)). Thus, the undersigned finds Salazar's excessive force claim against Defendant Hastings based on his decision to deploy Arlo must proceed beyond screening. *See, e.g., Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) (noting fact that "only three seconds elapsed between" officer's command and use of force, a jury could find "that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required 'measured and ascending' actions calibrated to [plaintiff's] conduct" (citation omitted)); *Lloyd v. Villareal*, No. 2:21-CV-00305, 2022 WL 1571779, at *6 (S.D. Tex. Apr. 6, 2022) (recommending plaintiff's excessive force claim survive screening, where he alleged that defendants shot him with chemical-agent balls and released a K9 even though he posed no threat during a traffic stop), *R. & R. adopted by* 2022 WL 1569717 (S.D. Tex. May 18, 2022); *Sanchez v. Baker*, 457 F. Supp. 3d 1143, 1153 (D.N.M. 2020) (denying defendants' motion for summary judgment on plaintiff's claim that deployment of K9

---

[14] Defendant Hastings' initial deployment of Arlo occurred much sooner—about seventeen seconds after discovering Salazar in the trunk, but Arlo did not make contact when it first entered the vehicle. Treharne BWC 16:10–:27.

constituted excessive force, where plaintiff "was neither actively fleeing nor reaching for a weapon, at least for the four seconds before [defendant] released [the dog]"); *cf. Sligh v. City of Conroe*, 87 F.4th 290, 299 (5th Cir. 2023) (concluding defendant's decision to release K9 arguably violated the Constitution, in part because defendants did not try "to escalate their use of physical force in a more measured manner" before siccing "a dog on a woman who . . . was not suspected of any crime . . . [and] did not pose an immediate safety threat to officers or others").

### 2. *Duration of Arlo's bite*

Salazar asserts that the duration of Arlo's bite was unconstitutional. *See* 2d Am. Compl. 5–6. Video footage shows that Arlo bit and held Salazar's arm for about one minute and twenty seconds, though Arlo may have released and reattached sometime during the incident. Hastings BWC 1:02:02–:03:26; *see* Tr. 10:19–11:16 (testifying that Arlo bit, released, and bit again). The video reflects that about thirty seconds after Arlo first bit, Salazar emerged from the trunk, and officers pulled him and Arlo (who remained attached to Salazar) from the vehicle to the ground. Hastings BWC 1:02:02–:03:26. Salazar twisted, moved, and rolled onto his stomach after several commands from officers. Hastings BWC 1:02:44–:03:25. Defendant Macias applied a cuff to Salazar's right wrist, and Defendant Hastings directed Arlo to release the bite. *Id.*; Macias BWC 33:26–34:15; Treharne BWC 18:05–:48. In total, about fourteen seconds elapsed between Salazar rolling onto his stomach and Arlo releasing the bite. Hastings BWC 1:03:11–:25. At the *Spears* hearing, Salazar asserted that officers encouraged Arlo to continue biting him and that Defendant Hastings should have maintained control of Arlo. Tr. 9:6–19, 12:11–13:17. Salazar does not contend Arlo continued biting him after the cuffs were applied. *See* 2d Am. Compl. 4–6; Tr. 11:14–12:5.

9

Considering Salazar's allegations and the video footage, screening is not the appropriate venue for making a final determination as to the reasonableness of the force, where the Court must examine the *Graham* factors in the context of and while liberally construing Salazar's allegations—e.g., conduct by Salazar and Defendant Hastings that may have escalated or deescalated the situation, dangers Salazar's conduct posed to Defendant Hastings and other officers, options available for handcuffing Salazar other than by leaving Arlo attached, etc. *See Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) ("Excessive force claims are necessarily fact-intensive: What is excessive in one case may be permissible in another." (internal quotation marks and citation omitted)); *Deville*, 567 F.3d at 167 ("[O]fficers must assess not only the need for force, but also the relationship between the need and the amount of force used." (internal quotation marks and citation omitted)). Thus, the undersigned concludes Salazar's allegation that the duration of Arlo's bite amounted to excessive force survives beyond screening. *Cf. Cooper v. Brown*, 844 F.3d 517, 521, 524 (5th Cir. 2016) (holding at summary judgment that officer "permitting a dog to continue biting a compliant and non-threatening arrestee" for approximately "one to two minutes" "is objectively unreasonable"); *Trammell v. Thomason*, 335 F. App'x 835, 844 (11th Cir. 2009) (reversing district court's grant of summary judgment, where K9 "attack continued for some significant length of time" and facts could support jury finding "that the officers failed to stop the attack promptly after they became aware that [plaintiff] was not the suspect").

### B. Bystander Liability

Salazar also alleges that Defendants Cisneros, Delarosa, Jaramillo, Lidiak, Uptain, Siegfried, Treharne, and Macias were present during the incident but failed to intervene and stop Defendant Hastings' purported use of excessive force. 2d Am. Compl. 3; Tr. 4:11–20, 19:14–

20:21. The Court similarly accepts these allegations as true, as it must at this stage of the proceedings.

An official's failure to intervene in another's use of excessive force against an arrestee may violate the Constitution and subject the official to § 1983 liability. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). To prevail on a bystander liability claim, a plaintiff must establish that an officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citation omitted).

The Court concludes Salazar's factual assertions state a claim sufficient to survive preliminary screening, i.e., claims for bystander liability, against Defendants. Because Salazar has adequately alleged an excessive force claim against Defendant Hastings, i.e., his purported constitutional violation in either releasing the K9 or not terminating its bite sooner, a triable question exists, at least at this juncture, as to whether the other Defendants had a reasonable opportunity to prevent the harm and chose not to act. *Cf. Greene v. DeMoss*, No. 3:20-CV-00578, 2020 WL 7755690, at *8–9 (W.D. La. Dec. 11, 2020) (finding defendants were not entitled to qualified immunity on plaintiff's bystander liability claims, where plaintiff alleged that each defendant used unconstitutional force and was therefore "necessarily . . . close enough to [plaintiff] that [each] could have opted to cease harming [plaintiff]," but instead watched the other defendants use force "without intervening"), *R. & R. adopted by* 2020 WL 7755655 (W.D. La. Dec. 29, 2020), *aff'd*, No. 21-30044, 2022 WL 3716201 (5th Cir. Aug. 29, 2022).

## II.  Recommendation

Given the timeframe set forth by the district judge in the referral order, it appears prudent to transfer the case back to the district judge for implementation of a scheduling order. Because

Defendants have asserted the affirmative defense of qualified immunity, it is the undersigned's **RECOMMENDATION** that the United States District Judge enter a limited scheduling order, requiring Defendants to file a dispositive motion for the purpose of making a preliminary determination on qualified immunity. *See* ECF No. 72, at 2 (raising several defenses, including qualified immunity); ECF Nos. 75, 78, 94 (same). Alternatively, the undersigned recommends that a Rule 16 scheduling order be entered, setting dates certain for pretrial deadlines and filing dispositive motions.

It is therefore **ORDERED** that the transfer of this case to the United States Magistrate Judge is terminated, and the case is hereby transferred back to the docket of the United States District Judge. This case shall hereinafter be designated as Civil Action Number 5:23-cv-054-H.

### III.   Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: July 25, 2024.

_____
D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE

13