## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| RYAN C. SALAZAR, | § | |
| Institutional I.D. No. 173119, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION No. 5:23-CV-054-H |
| | § | |
| UNKNOWN POLICE DOG | § | |
| HANDLER (K-9), *et al.,* | § | |
| *Defendants.* | § | |

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON THE DEFENSE OF QUALIFIED IMMUNITY

Respectfully submitted:

MATT D. MATZNER
Texas Bar No. 00797022
MORGAN DAY VAUGHAN
Texas Bar No. 24060769
CRENSHAW, DUPREE & MILAM, L.L.P.
P.O. Box 64479,
Lubbock, Texas 79464-4479
Telephone: (806) 762-5281;
Fax: (806) 762-3510
mmatzner@cdmlaw.com
mvaughan@cdmlaw.com
***Counsel for Defendants Hastings, Treharne, Siegfried, Likiak, Macias, Uptain, Cisneros, Delarosa, and Jarmillo***

# TABLE OF CONTENTS

Table of Contents ................................................................................................................. ii

Table of Authorities .......................................................................................................... iv

I.      Summary ................................................................................................................. 1

II.     Procedural Background ........................................................................................ 2

III.    Background Facts ................................................................................................. 5

      A.  The Plaintiff's Allegations Concerning the Use of Force on February 15, 2023 ......... 5

          1.  Deputies Were at The Plaintiff's Location To Serve Felony Arrest Warrants ................................................................................................................. 5

          2.  Deputies Knew The Plaintiff Was A Gang Member With A Violent Criminal History ................................................................................................ 6

          3.  When Deputies Moved In To Arrest The Plaintiff He Re-Entered The Residence Creating A Dangerous Situation For Deputies .............................. 6

          4.  Deputies Jaramillo, Lidiak, Uptain, Siegfried, and Treharne Searched The Residence With K-9 Lary and Did Not Locate The Plaintiff ................. 10

          5.  Deputies Moved To The Southside of the Residence To Enter An Exterior Garage Door And Search For The Plaintiff, First Sending In A K-9 To Locate The Plaintiff .................................................................................. 10

          6.  Deputies Entered The Garage After K-9 Arlo Failed To Locate The Plaintiff ................................................................................................................. 11

          7.  Deputies Located The Plaintiff Hiding In The Trunk of A Car ..................... 12

          8.  Because The Plaintiff Refused To Show His Hands And Crawl Out of The Car K-9 Arlo Was Deployed But Came Back Out Without Biting The Plaintiff ........................................................................................................ 14

          9.  The Plaintiff Refused To Comply With Additional Commands and K-9 Arlo Was Deployed A Second Time ............................................................ 15

         10. The Plaintiff Refused To Comply with Commands to Come Out of the The Vehicle After Being Bitten ..................................................................... 16

         11. The Use of K-9 Arlo to Bite The Plaintiff Even After He Was On The Ground Was Necessary Because He Had Not Been Searched And Was A Risk to Deputies .......................................................................................... 18

         12. Deputies Delarosa, Jaramillo, and Uptain Were Not In The Garage and Did Not Witness The Use of Force .............................................................. 20

      B.  The Plaintiff Did Not Have Surgery And Only Received Sutures And Antibiotics for His Wounds .......................................................................... 21

IV.    Summary Judgment Standard ........................................................................... 23

4880-8972-3354, v. 2

V.     Standard of Review—Qualified Immunity Defense Alters the Summary Judgment
       Burden of Proof..................................................................................................................25

VI.    The Purpose of Qualified Immunity & Its Well–Known Test...............................................26

VII.   Arguments and Authorities .................................................................................................28

       A. The Court Should Review The K-9 Deployment and Bite Duration Claims
          Under the *Graham v. Connor* Factors As They Were Perceived By Corporal
          Hastings...........................................................................................................................28

       B. Based On Recent Fifth Circuit Precent The Deployment of K-9 Arlo and The
          Duration of The Bite Does Not Violate Clearly Established Law.................................28

          1.  The Severity of the Crime At Issue Renders The K-9 Deployment and Bite
              Duration Reasonable Under *Graham*...................................................................30

          2.  The Second *Graham* Factor Weighs In Favor of Corporal Hastings And
              Renders His K-9 Deployment Reasonable Under the Circumstances ..................31

          3.  The Second *Graham* Factor Concerning The Immediate Threat To Officer
              Safety Also Weighs in Favor of Corporal Hastings When Considering the
              Bite Duration ......................................................................................................36

          4.  The Plaintiff's Active Resistance Renders the Deployment And Bite
              Duration Reasonable............................................................................................40

VIII.  The Bystander Liability Claim Against Deputies Cisneros, Lidiak, Siegfried, Treharne, and
       Macias Should Be Dismissed ............................................................................................43

       A. The Bystander Liability Claims Against The Deputies In The Garage Should Be
          Dismissed .......................................................................................................................43

       B. The Standard for Reviewing Bystander Liability Claims .............................................46

       C. The Brevity of An Incident Weighs Against The Imposition of Bystander Liability .......37

IX.    The Bystander Liability Claim Against Deputies Uptain, Jaramillo, and Delarosa Should Be
       Dismissed Because They Were Not In the Garage..............................................................48

X.     Conclusion..........................................................................................................................49

iii

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Aguirre v. City of San Antonio,*
995 F.3d 395 (5th Cir. 2021) ................................................................ 28

*Anderson v. Creighton,*
483 U.S. 635 (1987) ............................................................................. 26

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................ 23, 24

*Ashcroft v. Al–Kidd,*
563 U.S. 731 (2011) ............................................................................. 25

*Bailey v. Iles,*
No. 22-30509, 2023 WL 8062239 (5th Cir. Nov. 21, 2023) ................. 26

*Baker v. Coburn,*
68 F.4th 240 (5th Cir. 2023) ............................................................ 26, 27

*Baker v. Cohen,*
2010 WL 3385266 (S.D. Fla. Aug. 5, 2010) ........................................ 33

*Brooks v. Taylor Cty.,*
No. 1:20-CV-049-H, 2021 WL 4458380 (N.D. Tex. Sept. 29, 2021) ..... 46

*Brown v. Callahan,*
623 F.3d 249 (5th Cir. 2010) ............................................................... 25

*Carpenter v. Itawamba Co. Jail,*
597 F. Supp. 3d 977 (N.D. Miss. 2022) ........................................... 34, 35

*Celoxtex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................ 23, 24

*Cole v. Carson,*
935 F.3d 444 (5th Cir. 2019) ............................................................... 26

*Crenshaw v. Lister,*
556 F.3d 1283 (11th Cir. 2009) ........................................................... 39

*Douglass v. United Servs. Auto. Ass'n,*
79 F.3d 1415 (5th Cir. 1996) ............................................................... 24

4880-8972-3354, v. 2

*El v. City of Pittsburgh*,
    975 F.3d 327 (3d Cir. 2020) ........................................................................ 48

*Escobar v. Montee*,
    895 F.3d 387 (5th Cir. 2018) ......................................... 34, 38, 39, 42

*Eversley v. MBank Dall.*,
    843 F.2d 172 (5th Cir. 1988) ............................................... 24, 25

*Forsyth v. Barr*,
    19 F.3d 1527 (5th Cir. 1994) .................................................... 24

*Graham v. Connor*,
    490 U.S. 386 (1989) ...................................................... 2, 28, 29

*Griggs v. Brewer*,
    841 F.3d 308 (5th Cir. 2016) ................................................ 28, 42

*Hale v. Towley*,
    45 F.3d 914 (5th Cir. 1995) ......................................................... 46

*Hamilton v. Kindred*,
    845 F.3d 659 (5th Cir. 2017) ..................................................... 2

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) .................................................................. 26

*Henderson v. Harris Cnty.*,
    51 F.4th 125 (5th Cir. 2022) ....................................................... 34

*Hicks v. LeBlanc*,
    81 F.4th 497 (5th Cir. 2023) ................................................. 26, 27

*Hinson v. Martin*,
    853 F. App'x 926,(5th Cir. 2021) ........................................ 30, 31, 32

*Hogan v. Cunningham*,
    722 F.3d 725 (5th Cir. 2013) ..................................................... 28

*Jarrett v. Town of Yarmouth*,
    331 F.3d 140 (1st Cir. 2003) ...................................................... 33

*Joseph ex rel. Estate of Joseph v. Bartlett*,
    981 F.3d 319 (5th Cir. 2020) ................................................ 43, 48

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) ..................................................... 26

*Lytle v. Bexar Cty..,*
   560 F.3d 404 (5th Cir. 2009) ............................................................... 27

*Morrow v. Meachum,*
   917 F.3d 870 (5th Cir. 2019) ............................................................... 25

*Nowell v. Acadian Ambulance Serv.,*
   147 F. Supp. 2d 495 (W.D. La. 2001) ............................................. 48, 49

*Olabisiomotosho v. City of Houston,*
   185 F.3d 521 (5th Cir. 1999) ............................................................... 23

*Palmer v. Johnson,*
   193 F.3d 346 (5th Cir. 1999) ............................................................... 26

*Paternostro v. Crescent City Connection Police Dep't,*
   No. CIV.A. 00-2740, 2002 WL 34476319 (E.D. La. Apr. 2, 2002) ........................................ 49

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ............................................................................ 26

*Pena v. City of Rio Grande City,*
   879 F.3d 613 (5th Cir. 2018) ............................................................... 28

*Poole v. City of Shreveport,*
   691 F.3d 624 (5th Cir. 2012) ............................................................... 41

*Ragas v. Tenn. Gas Pipeline Co.,*
   136 F.3d 455 (5th Cir. 1998) ............................................................... 24

*Rawlings v. Se. Pennsylvania Transp. Auth.,*
   No. 2:19-CV-04698, 2022 WL 15525755 (E.D. Pa. Oct. 27, 2022) ........................................ 47

*Resol. Tr. Corp. v. Starkey,*
   41 F.3d 1018 (5th Cir. 1995) ............................................................... 25

*Salazar v. Molina,*
   37 F.4th 278 (5th Cir. 2022) ....................................................... 31, 33, 34

*Saucier v. Katz,*
   533 U.S. 194 (2001) ...................................................................... 26, 27

*SEC v. Recile,*
   10 F.3d 1093 (5th Cir. 1993) ............................................................... 24

*Shumpert v. City of Tupelo,*
   905 F.3d 310 (5th Cir. 2018) ............................................................... 32

4880-8972-3354, v. 2

*Singleton v. Casanova*,
  No. 22-50327, 2024 WL 2891900 (5th Cir. June 10, 2024) ............................................ 28, 29

*Smith v. Lee*,
  73 F.4th 376 (5th Cir. 2023) ................................................................................. passim

*Stanton v. Sims*,
  571 U.S. 3 (2013) ................................................................................................................ 25

*State Farm Life Ins. Co. v. Gutterman*,
  896 F.2d 116 (5th Cir. 1990) ............................................................................................ 24

*Stevenson v. City of Albuquerque*,
  446 F. Supp. 3d 806 (D.N.M. 2020) ................................................................................. 47

*Thompson v. Upshur Cty.*,
  245 F.3d 447 (5th Cir. 2001) ............................................................................................ 26

*Thomson v. Salt Lake Cnty.*,
  584 F.3d 1304 (10th Cir. 2009) ........................................................................................ 33

*Vette v. K-9 Unit Deputy Sanders*,
  989 F.3d 1154 (10th Cir. 2021) ........................................................................................ 30

*Wallace v. County of Comal*,
  400 F.3d 284 (5th Cir. 2005) ............................................................................................ 27

*Weisshaus v. Teichelman*,
  637 F. Supp. 3d 434 (N.D. Tex. 2022) ................................................................. 26, 27, 28

*Woodard v. Carol*,
  630 F. Supp. 3d 806 (W.D. La. 2022) ........................................................................ passim

## RULES

FED. R. CIV. P. 56(e) ................................................................................................... 24, 25

vii

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| RYAN C. SALAZAR, | § | |
| Institutional I.D. No. 173119, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION No. 5:23-CV-054-H |
| | § | |
| UNKNOWN POLICE DOG | § | |
| HANDLER (K-9), *et al.,* | § | |
| *Defendants.* | § | |

## DEFENDANTS' BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT ON THE DEFENSE OF QUALIFIED IMMUNITY OF DEFENDANTS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE, JAMES WESLEY HENDRIX:

COME NOW Defendants Stephen Hastings, Gregory Treharne, Tracey Siegfried, Cole Lidiak, Michael Macias, Jordan Uptain, Joshua Cisneros, Samuel Delarosa, and Joseph Jaramillo and file their Brief in Support of Motion for Summary Judgment on the Defense of Qualified Immunity, and in support thereof would show the Court as follows:

## I.

### SUMMARY

Pursuant to Northern District of Texas Local Rule 56.3(a), Defendants Stephen Hastings, Gregory Treharne, Tracey Siegfried, Cole Lidiak, Michael Macias, Jordan Uptain, Joshua Cisneros, Samuel Delarosa, and Joseph Jaramillo set forth the summary judgment issues before the Court:

1.    Deputy Stephen Hastings is entitled to summary judgment because evidence establishes that based on the *Graham* factors and the perception of Corporal Hastings at the time: his deployment of K-9 Arlo to apprehend the Plaintiff was reasonable due to the severity of the crime at issue, the immediate threat the Plaintiff posed to officers and others, and due to the

Plaintiff's active resistance and refusal to follow commands. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Additionally, based on the *Graham* factors and the perception of Corporal Hastings at the time: the duration of the bit of K-9 Arlo was reasonable due to the severity of the crime at issue, the immediate threat the Plaintiff posed to officers and others, and due to the Plaintiff's active resistance and refusal to follow commands. *Id.* Moreover, the Fifth Circuit has held in a situation with a suspect with a felony warrant hiding and officers searching for him "no precedent establishes under analogous circumstances how long a bite is too long." *Smith v. Lee*, 73 F.4th 376, 385, 387 (5th Cir. 2023).

2.      Deputies Uptain, Delarosa, and Jaramillo are entitled to summary judgment on the bystander liability claim because the summary judgment evidence and video demonstrates they did not know a fellow officer was allegedly violating the Plaintiff's constitutional rights; they did not have a reasonable opportunity to prevent the alleged harm; and they did not choose not to act. *See Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017). This is because these three officers were not in the garage where the deployment of K-9 Arlo and his biting of the Plaintiff took place.

3.      Deputies Cisneros, Lidiak, Uptain, Siegfried, Treharne and Macias are entitled to summary judgment on the bystander liability claim because the summary judgment evidence and video demonstrates a fellow officer was not allegedly violating the Plaintiff's constitutional rights. Because these officers were present during the use of force, which was reasonable under the circumstances based on the *Graham* factors and the threat to officers from the Plaintiff's actions, they are not liable as bystanders to a citizen's rights being violated. *See Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017).

## II.
### PROCEDURAL BACKGROUND

The Plaintiff filed his Complaint on March 17, 2023. *See* Pl.'s Compl. (Doc. 1). In his

Complaint, the Plaintiff made allegations against the Lubbock County K-9 Handler NFN NLN, Lubbock County Sheriff's Office SWAT team, and the Lubbock County Sheriff's Office for their use of force, and in particular the deployment of K-9 and the duration of the K-9 bite, on February 15, 2023 when the Plaintiff was arrested on several felony warrants. *See* Pl.'s Compl. (Doc. 1) at 4, 6. Within the Plaintiff's Original Complaint he sought 3 million dollars for his alleged damages. *Id*. at 4.

The Plaintiff sought leave from the Court on April 13, 2023 to file an amended complaint. *See* Pl.'s Motion for Leave (Doc. 12). The Court granted him such leave and the Plaintiff filed an Amended Complaint on April 19, 2023. *See* Order Granting Leave (Doc. 15), Pl.'s Am. Compl. (Doc. 16). Within the Plaintiff's Amended Complaint he increased the relief he sought to 5 million dollars for his alleged damages. That same month the Plaintiff sought leave to file another Amended Complaint. *See* Pl.'s Mot. for Leave (Doc. 19). The Court granted this motion and on April 28, 2023 the Plaintiff filed his Second Amended Complaint. *See* Order Granting Motion to File Amended Complaint (Doc. 21); Pl.'s Second Am. Compl. (Doc. 22). Within the Plaintiff's Second Amended Complaint he abandoned the official capacity claims against the individual officers; however, his monetary demand remained 5 million dollars. *See* Pl.'s Second Am. Compl. (Doc. 22) at 4.

U.S. Magistrate Judge D. Gordon Bryant held a *Spears* hearing on July 6, 2023. *See* Order Setting Evidentiary Hearing (Doc. 32); Minute Entry (Doc. 33). Following the *Spears* hearing Judge Bryant issued an Order of Partial Dismissal and Order to Stay Excessive Force and Bystander Liability. *See* Order of Partial Dismissal (Doc. 34). Within that order the Court clarified the Plaintiff was asserting claims against the following Defendants: (1) Corporal Stephen Hastings; (2) Sergeant Joshua Cisneros; (3) Sergeant Samuel Delarosa; (4) Deputy Joseph

Jaramillo; and (5) "all arresting LCSO deputies on the scene of his February 15, 2023 arrest." *See* Order of Partial Dismissal (Doc. 34) at 3. The Court made clear the Defendants were being sued in their individual capacities. *See* Order of Partial Dismissal (Doc. 34) at 3. Within the Order of Partial Dismissal the Court dismissed: (1) the Plaintiff's request officers be terminated; (2) claims that occurred after the filing of the litigation concerning a denial of medical care/treatment and proper access to the courts/law library; (3) claims of defamation related to his contention he was falsely labeled as a gang member; (4) claims of perjury based on the alleged defamation; (5) claims of retaliation. *See* Order of Partial Dismissal (Doc. 34) at 8-13.

The Court stayed the Plaintiff's excessive force claim against Corporal Hastings because it was potentially *Heck*-barred due to the Plaintiff's pending state court criminal charges in *State of Texas v. Ryan Salazar*, Cause No. CC-2023-CR-0580 in County Court at Law No. 1 in Lubbock County, Texas for evading arrest or detention during the February 15, 2023 incident. *See* Ex. L (Pleadings from CC-2023-CR-0580). *See* Order of Partial Dismissal (Doc. 34) at 18. The Court also dismissed the excessive force claim against Sergeant Treharne for allegedly squeezing his arm finding:

> The video likewise reflects Salazar did not scream in pain at any time during the walk to the tailgate, but instead threatened to sue 'everyone' multiple times. *Id*. Because the video clearly refutes Salazar's contention that Sergeant Treharne used excessive force during the escort from the garage to the pickup, the Court dismisses Salazar's claim against Treharne.

*See* Order of Partial Dismissal (Doc. 34) at 21.

The Court stayed the bystander liability claims against the officer Defendants premised on the excessive force allegation related to the K-9's release and bite due the pending state court criminal charges. *Id*. at 22. The Court also dismissed the Plaintiff's Fourth Amendment claim related to his allegations of an illegal search. *Id*. at 24-25. The Court dismissed failure-to-train

claims against Corporal Hastings and Sergeants Cisneros and Delarosa for failure to state a claim finding that the claims were "conclusory and devoid of specific factual allegations." *Id.* at 28.

As a result of the Court's Order of Partial Dismissal the claims that remained pending were for excessive force against Corporal Hastings and for bystander liability against all Defendants based on Corporal Hastings' allegation of use of excessive force. *Id.* at 28-29. This was re-opened on February 5, 2024 after the conclusion of the criminal cases. *See* Order (Doc. 59). On September 19, 2024 this Court adopted the Magistrate Judge's Findings, Conclusions, and Recommendations and issued a deadline of November 18, 2024 for the Defendants file to file Motions for Summary Judgment on the issue of qualified immunity. *See* Order Accepting FCR (Doc. 98). This motion is being filed consistent with this Order.

### III.
### BACKGROUND FACTS

**A. The Plaintiff's Allegations Concerning the Use of Force on February 15, 2023**

**1.  *Deputies Were at The Plaintiff's Location To Serve Felony Arrest Warrants***

On February 15, 2023 Deputy Defendants Stephen Hastings, Gregory Treharne, Tracey Siegfried, Cole Lidiak, Michael Macias, Jordan Uptain, Joshua Cisneros, Samuel Delarosa, and Joseph Jaramillo ("deputies") were all law enforcement officers with the Lubbock County Sheriff's Office. *See* Ex. C (Cisneros Decl.) at ¶¶ 2-3 [App. 101]; Ex. D (Delarosa Decl.) at ¶¶ 2-3 [App. 104]; Ex. E (Jaramillo Decl.) at ¶¶ 2-3 [App. 106]; Ex. F (Lidiak Decl.) at ¶¶ 2-3 [App. 109]; Ex. H (Siegfried Decl.) at ¶¶ 2-3 [App. 116]; Ex. I (Treharne Decl.) at ¶¶ 2-3 [App. 120]; Ex. J (Macias Decl.) at ¶¶ 2-3 [App. 124]; Ex. K (Hastings Decl.) at ¶¶ 2-3 [App. 128]. The deputies were at the home of the Plaintiff's grandmother to serve felony warrants for the Plaintiff's arrest. *See* Ex. A-1 (Officer Reports) at [App. 003-054]; Ex. C at ¶ 3 [App. 101]; Ex. D at ¶ 3 [App. 104]; Ex. E at ¶ 3 [App.106]; Ex. F at ¶¶ 3-4 [App. 109-110]; Ex. H at ¶¶ 3-4 [App.116];

Ex. I at ¶ 3 [App. 120]; Ex. J at ¶ 3 [App. 124]; Ex. K at ¶ 3 [App. 128].

These felony warrants the Plaintiff was being arrested on were for Evading Arrest/Detention With a Vehicle a third-degree felony, Unauthorized Use of A Motor Vehicle a state jail felony, as well as two misdemeanor warrants for theft and criminal mischief.  *See* Ex. E at ¶ 3 [App. 106]; Ex. F at ¶ 4 [App. 109-110]; Ex. H at ¶ 4 [App.116].

### 2. *Deputies Knew the Plaintiff Was A Gang Member With A Violent Criminal History*

In addition to being at the location to arrest the Plaintiff on outstanding felony warrants the deputies also knew the Plaintiff was a member of the West Texas Tangos pursuant to Texas Code of Criminal Procedure Chapter 67 and also knew he had a violent criminal history. *See* Ex. C at ¶¶ 4-5 [App. 101-102]; Ex. E at ¶¶ 3-4 at [App. 106-107]; Ex. F at ¶¶ 4-5 [App. 109-110]; Ex. H at ¶¶ 4-5 [App. 116-117]; Ex. I at ¶¶ 4-5 [App. 120-121]; Ex. K at ¶ 4 [App. 129].  As explained by Deputy Jaramillo:

> From my training and experience, I know West Texas gang members are involved in criminal activities to include weapons violations, narcotics trafficking, aggravated assaults, aggravated robberies, and homicides.  I also knew that gang members are often armed with firearms to protect themselves from rival gangs.  I reviewed the criminal history Ryan Salazar prior to arriving at the scene and knew that he had an extensive and violent criminal history that included arrests for aggravated assault and felony convictions for aggravated robbery.

*See* Ex. E at ¶ 4 [App. 107].

*See also* Ex. C at ¶ 5 [App. 102]; Ex. F at ¶ 5 [App. 110]; Ex. H at ¶ 5 [App. 1117]; Ex. I at ¶ 5 [App. 121]; Ex. J at ¶ 5 [App. 125]; Ex. K at ¶ 4 [App. 129].

### 3. *When Deputies Moved In To Arrest The Plaintiff He Re-Entered the Residence Creating A Dangerous Situation for Deputies*

The Plaintiff had been observed standing outside of his grandmother's home but when

deputies began to drive up to arrest him he re-entered the house. *See* Ex. A-1 at [App. 018-021]; Ex. G at ¶ 4 [App. 113-114]. Ex. H at ¶ 6 [App. 117]; Ex. K at ¶ 3 [App. 128-129]. The declaration of Deputy Jaramillo states:

> Prior to my arrival at the scene other deputies established covert surveillance on the residence at 6101 Avenue Q, Lubbock, Texas and a takedown plan was formulated. Mr. Salazar was positively identified as he exited the residence with a beer in his hand. He remained outside briefly and re-entered the home. Constant surveillance remained on the residence and a vehicle was observed pulling in front of the residence along the street. Mr. Salazar was observed walking outside to speak with the driver of the vehicle. The takedown signal was given and investigators converged on the vehicle in an attempt to take Mr. Salazar into custody, but he went back into the home at 6101 Avenue Q as investigators were approaching. Investigators immediately surrounded the home and established a perimeter around the residence. Investigators activated emergency lights and sirens to their vehicles and made several announcements over the intercom system towards the residence for Salazar to exit the home. I held perimeter security announcements continued to be made. Mr. Salazar's girlfriend Ms. Vivian Moreno exited the home and was taken into custody. Ms. Moreno told investigators that Mr. Salazar had jumped the back fence of the residence and fled. This was not believed by investigators because no one observed Mr. Salazar doing these things. Additionally, shortly after the claims of Ms. Moreno, deputies observed Mr. Salazar shutting and securing the front door to the residence. Investigators used a public address system to make announcements for Mr. Salazar to come out of the house but he continued to refuse to comply.

*See* Ex. E at ¶ 5 [App.107].

Because the Plaintiff went back in the house the deputies obtained a search warrant from the Hon. Les Hatch, District Judge of the 237th District Court, to enter the premises and execute the arrest warrants for the Plaintiff. *See* Ex. A-1 at [App. 020]; Ex. C at ¶ 3 [App. 101]; Ex. E at ¶ 6 [App. 107]; Ex. F at ¶ 6 [App. 110]; Ex. G at ¶ 5 [App. 114]; Ex. H at ¶ 6 [App. 117]; Ex. I at ¶ 3 [App. 120]; Ex. J at ¶ 3 [App. 124]; Ex. K at ¶ 3 [App. 128-129]. The process obtaining a warrant took a great deal of time, approximately 60 minutes, and during this time deputies used

the public address to make announcements for the Plaintiff to come out of the house.  *See* FCR (Doc. 96) at 4, Ex. A-1 at [App. 030], A-4 at 0:00-6:11 [App. 077], Ex. E at ¶¶ 5-6 [App. 107], Ex. F at ¶¶ 6-7 [App. 110-], Ex. G at ¶¶ 4-6 [App. 113-114], Ex. H at ¶¶ 6-7 [App.117], Ex. I at ¶¶ 6-7 [App. 121], Ex. J at ¶¶ 6-7 [App. 125].    During this time deputies surrounded the house and established a perimeter around the residence.  *See* Ex. A-1 at [App. 019], Ex. E at ¶¶ 5-6 [App. 107], Ex. F at ¶¶ 6-7 [App. 110], Ex. G at ¶¶ 4-6 [App. 113-114], Ex. H at ¶¶ 6-7 [App. 117], Ex. I at ¶¶ 6-7 [App. 121].  Deputies activated emergency lights and sirens on their vehicles and made several announcements over the intercom system towards the residence for the Plaintiff to exit the home. *See* FCR (Doc. 96) at 4, Ex. A-1 at [App. 019], Ex. E at ¶¶ 5-6 [App. 107], Ex. F at ¶¶ 6-7 [App. 110], Ex. G at ¶¶ 4-5 [App. 113-114], Ex. H at ¶¶ 6-7 [App. 117], Ex. I at ¶¶ 6-7 [App. 121], Ex. J at ¶¶ 6-7 [App. 125].  Deputy Lidiak made several callouts over his public address system for the Plaintiff to exit the residence.  *See* Ex. A-1 at [App. 008, 035. 038, 050], Ex. F at ¶¶ 6-7 [App.110], Ex. I at ¶¶ 6-7 [App.121], Ex. J at ¶¶ 6-7 [App. 125].  As Deputy Lidiak gave instructions over his public address for the Plaintiff to exit his residence he instead observed Mr. Salazar to have walked to the front door and closed it. *See* Ex. A-1 at [App. 008]; Ex. E at ¶¶ 6-7 [App. 107-108],  Ex. G at ¶¶ 4-5 [App. 113-114], Ex. H at ¶¶ 6-7 [App. 117], Ex. I at ¶¶ 6-7 [App. 121], Ex. J at ¶¶ 6-7 [App. 125].   Because the Plaintiff failed to comply with the orders to come out of his residence after the search warrant was signed deputies used a Ballistic Armored Tactical Transport (BATT) to ram the front door open, and after the door was opened they lined up to search for Mr. Salazar.  *See* FRC (Doc. 96) at 4, Ex. A-1 at [App. 020, 038, 051, 054], Ex. A-3 at 1:01-7:30 [App. 076], Ex. A-4 at 00:00-29:18 [App. 077], A-5 at 00:00-12:00 [App. 078], Ex. E at ¶¶ 6-7 [App. 107-108], Ex. F at ¶ 7-8 [App. 110], Ex. G at ¶¶ 5-6 [App. 114], Ex. H  at ¶¶ 7-8 [App. 117], Ex. I at ¶¶ 7-8 [App. 121], Ex. J at ¶¶ 6-7 [App. 125].

As noted by the Magistrate Judge after this point the parties versions of what happened next differs; however, video footage provided by Lubbock County "plainly refutes some of Salazar's claims." *See* FCR (Doc. 96) at 4. After the front door was breached and deputies had lined up to prepare to enter the residence additional commands were given from the BATT telling the Plaintiff to exit the residence; however, he continued to refuse to comply with these commands. *See* Ex. A-1 at [App. 020, 038], Ex. A-3 at 1:01-7:30 [App. 076], Ex. E at ¶¶ 6-7 [App. 107-108], Ex. H at ¶¶ 7-8 [App. 117], Ex. I at ¶¶ 7-8 [App. 121], Ex. J at ¶¶ at 6-7 [App. 125]. Once deputies were lined up at the front door of the residence the Plaintiff was specifically warned by Cpl. Daniel, the K-9 handler for K-9 Lary, that if he did not come out of the residence a K-9 would be deployed and it would bite. *See* Ex. A-4 at 6:30-6:44 [App. 077], Ex. H at ¶ 9 [App. 117], Ex. J at ¶ 7 [App. 125], Ex. I at ¶ 8 [App. 121]. Concerning these warnings Staff Sergeant Macias testified "[t]hese announcements were so loud, I could hear him from approximately 40 yards away from the direction he was yelling his announcements." *See* Ex. J at ¶ 7 [App. 125]. The refusal of the Plaintiff to come out of the residence created an extremely dangerous situation for law enforcement deputies. *See* Ex. F at ¶ 8 [App. 110], Ex. H at ¶ 8 [App.117], Ex. I at ¶ 6 [App. 121], Ex. J at ¶ 6 [App. 125]. As explained by Deputy Lidiak at this point "the situation was very dangerous to law enforcement because we had a suspect in felony level crimes, with a history of violent convictions that was hiding from law enforcement and refusing to comply with commands as we entered his home." *See* Ex. F at ¶ 8 [App. 110]. Staff Sergeant Treharne explained it by testifying "[a]s law enforcement officers we knew there was suspect who was hiding and fleeing arrest, had a history of violent crimes, and was potentially lying in wait for us creating a trap or intended to harm us when we entered the residence or located him." *See* Ex. I at ¶ 6 [App. 121].

**4.** ***Deputies Jaramillo, Lidiak, Uptain, Siegfried, and Treharne Searched The Residence With K-9 Lary and Did Not Locate The Plaintiff***

Because the Plaintiff refused to comply with the orders to exit the house Deputies Jaramillo, Lidiak, Uptain, Siegfried, and Treharne entered the front of the residence and searched for the Plaintiff with the help of Corporal Daniel and K-9 Lary. *See* Ex. A-4 at 8:25-18:25 [App. 077], A-6 at 00:00-14:00 [App. 079], Ex. E at ¶ 7 [App. 107-108], Ex. F at ¶ 9 [App. 110], Ex. G at ¶ 6 [App. 114], Ex. H at ¶ 9 [App. 117], Ex. I at ¶ 8 [App. 121], Ex. J at ¶ 7 [App. 125]. These deputies did not locate the Plaintiff in the house or in the areas they had access to. *Id.* Sergeant Cisneros did not participate in the search of the residence at this time but instead when he arrived he joined deputies at the rear of the residence and outside of the garage. *See* Ex. C at ¶ 6 [App. 102]. Additionally, Deputy Delarosa did not participate in this search or the subsequent search of the garage. *See* Ex. D at ¶¶ 4-6 [App. 104-105]. At this time Staff Sergeant Macias was also outside of the residence but could hear what was happening. *See* Ex. J at ¶¶ 7-8 [App. 125]. Corporal Hastings was at the rear of the residence at this time. *See* Ex. K at ¶¶ 3-6 [App. 128-129].

**5.** ***Deputies Moved To The Southside of the Residence To Enter An Exterior Garage Door and Search For The Plaintiff, First Sending in A K-9 To Locate The Plaintiff***

Because the Plaintiff could not be located in the house Deputies Lidiak, Siegfried, and Treharne decided to search the garage area of the residence and went to the southside of the residence in the backyard to do that so they could search the garage for the Plaintiff. *See* A-6 at 00:00-14:00 [App. 079], Ex. C at ¶ 6 [App. 102], Ex. F at ¶ 10 [App. 110-111], Ex. H at ¶ 10 [App. 117], Ex. I at ¶¶ 8-9 [App. 121], Ex. J at ¶¶ 7-8 [App. 125], Ex. K at ¶ 6 [App. 129]. At this time Sergeant Cisneros approached the rear of the residence and joined the other deputies outside of the garage. *See* Ex. C at ¶ 6 [App. 102]. At this time Deputy Michael Macias also

went to the other side of the residence in case additional K-9 assistance was necessary. *See* Ex. J at ¶ 8 [App. 125]. At this time Corporal Hastings, the K-9 handler for K-9 Arlo, was asked to move up with SWAT deputies to the rear of the residence to search the garage area for the Plaintiff. *See* Ex. K at ¶ 3, 6 [App. 128-129]. At this time SWAT deputies opened the door to the garage and gave additional commands to the Plaintiff from outside of the garage. *See* Ex. F at ¶ 10 [App. 110-111], Ex. H at ¶ 10 [App. 117]. The Plaintiff did not come out despite the warnings. *Id.* Because of this, K-9 Arlo was deployed by Corporal Hastings to search for the Plaintiff in the garage before deputies entered it. *See* Ex. A-7 at 56:10-57:15 [App. 080], Ex. C at ¶ 6 [App. 102], Ex. F at ¶ 10 [App. 110-111], Ex. H at ¶ 10 [App. 117], Ex. I at ¶ 8 [App. 121]. As Corporal Hastings explained "[t]here were many places that Mr. Salazar could be hiding from officers with weapons, it was safer to send in K-9 Arlo to conduct an initial search. He could come into contact with the suspect without risking an officer coming into contact and being shot." *See* Ex. K at ¶ 6 [App. 129]. Unfortunately, K-9 Arlo did not locate the Plaintiff in the garage. *Id.*, Ex. A-7 at 56:10-57:15 [App. 080].

### 6.  *Deputies Entered the Garage After K-9 Arlo Failed To Locate The Plaintiff*

Because K-9 Arlo did not locate the Plaintiff SWAT deputies entered the garage. *See* Ex. C at ¶ 6 [App. 102], Ex. F at ¶ 10 [App. 110-111], Ex. H at ¶ 10 [App.117], As explained by Sergeant Cisneros "[t]his was a dangerous situation with a suspect that had a violent past criminal history, gang connections, and had ran into his house when law enforcement attempted to apprehend him and now had remained hidden from law enforcement as loud announcements and two k-9s searched for him." *See* Ex. C at ¶ 6 [App. 102]. Deputies entered the garage and again gave loud warnings for the Plaintiff to come out of hiding or a dog would be deployed and he needed to surrender, or force would be used. *See* Ex. A-8 at 29:10-30:30 [App. 081], Ex. C at ¶

7 [App. 102], Ex. I at ¶ 9 [App. 121], Ex. J at ¶ 8 [App. 125], Ex. K at ¶ 7 [App. 129-130].

Corporal Hastings has testified at this time he heard Sgt. Siegfried yell commands for the Plaintiff

to come out with his hands up.  *See* Ex. K at ¶ 7 [App. 129-130].

### 7.  *Deputies Located The Plaintiff Hiding In The Trunk of a Car*

Although deputies initially believed the Plaintiff was hiding in the attic of the garage

deputies also began searching a vehicle in the garage and located the Plaintiff there hiding in the

trunk.  *See* Ex. C at ¶ 7 [App. 102], Ex. F at ¶ 11 [App. 111], Ex. H at ¶ 11 [App. 117-118], Ex.

I at ¶ 10 [App. 122], Ex. J at ¶ 9 [App. 125-126], Ex. K at ¶ 7 [App. 129-130].   Sgt. Cisneros has

explained at this time he was pointing his weapon at the attic and heard deputies search a vehicle

and locate the Plaintiff.  *See* Ex. C at ¶ 7 [App. 102].  Staff Sergeant Treharne explained when he

entered the garage he observed a four door car inside the garage and he attempted to open the

trunk but there was no electrical power to it.  *See* Ex. I at ¶ 10 [App. 122], A-6 at 16:00-17:00

[App. 078].  Sgt. Macias advised him when he attempted to fold down the back seat to gain access

to the trunk he felt resistance and asked Staff Sergeant Treharne to cover him as he folded down

the seat.  *Id*.  When the seat came back Staff Sergeant Treharne saw the Plaintiff laying in the

trunk.  *Id*.  Staff Sergeant Treharne testified he could not see the Plaintiff's hands or the area

around him and this was a dangerous situation.  *Id*. Staff Sergeant Treharne testified the Plaintiff

lifted his left hand but that Staff Sergeant Treharne could not see the Plaintiff's right hand and so

he repeatedly ordered the Plaintiff to show him his hands and get out of the trunk; however, the

Plaintiff continued his non-compliance.  *Id*.

Similarly, Staff Sergeant Macias has testified when he entered the garage he observed a

four door car inside the garage.  *See* Ex. A-8 at 30:40-32:07 [App. 081], Ex. J at ¶ 9 [App. 125-

126].  He opened the back door and could see the passenger compartment was clear of any

occupants. *Id*. Staff Sergeant Macias attempted to access the trunk of the vehicle by utilizing the back seats. *Id*. After he released the latch he felt like someone was holding up the backseat. *Id*. He called out to other deputies and told them what he found and asked them to hold their weapons trained on the back seat while he attempted to access the trunk from the passenger side. *Id*. As he released the latch and laid down the back seat, allowing a visual into the trunk, he could hear Staff Sergeant Treharne start to give commands to the Plaintiff to show his hands. *Id*. Staff Sergeant Macias has also provided declaration testimony explaining this was a very dangerous situation for deputies because they had located the Plaintiff but could not see his hands or tell if he was armed with weapons he intended to use against law enforcement. *Id*. He also overheard another deputy yell in warning to the Plaintiff that if he did not crawl out of the vehicle a K-9 would be sent in to bite him; however, the Plaintiff did not comply. *Id*., A-6 at 16:00-17:00 [App. 078]. The actions of the Plaintiff in refusing to show both of his hands or exit the vehicle created a very dangerous situation for deputies. *See* Ex. C at ¶ 8 [App. 102].

At this time Sergeant Cisneros heard deputies give loud orders to the Plaintiff to show his hands and come out of the vehicle. *See* Ex. C at ¶ 7 [App. 102], A-6 at 16:00-17:00 [App. 079], A-7 at 1:00:50-55. Sergeant Cisneros has testified the Plaintiff failed to comply with this order. *See* Ex. C at ¶ 7 [App. 102]. Deputy Lidiak also overheard another deputy warn the Plaintiff if he did not crawl out of the vehicle a K-9 would be sent in to bite him and observed the Plaintiff did not comply with these orders. *See* Ex. F at ¶ 12 [App. 111], A-6 at 16:00-17:00 [App. 079]. Staff Sergeant Siegfried testified he also heard Sgt. Treharne give commands to the Plaintiff to show his hands. *See Id*., Ex. H at ¶ 11 [App. 117-118]. Staff Sergeant Siegfried explained "[t]his was a very dangerous situation for deputies because at this point we had located Mr. Salazar but could not see his hands or tell if he was armed with weapons he intended to use against law

enforcement.  I overheard multiple deputies yell in warning to Mr. Salazar that if he did not crawl out of the vehicle a K-9 would be sent in to bite him." *Id.*  However, the Plaintiff did not comply. Staff Sergeant Siegfried also testified concerning the danger to deputies from the Plaintiff's actions:

> His actions presented an immediate danger to officers that were all within a close range.  This is especially true given the fact he had just engaged in a standoff with officers, refusing to come out as we attempted to execute felony warrants.  As officers we were aware of his violent past and that we were executing felony warrants, and were in a vulnerable position because we did not know if other individuals were also hiding and could do us harm as we focused on Mr. Salazar. We needed to quickly address the dangerous situation and K-9 Arlo could do that while minimizing the safety risk to officers.

*See* Ex. H at ¶ 11 [App. 117-118].

### 8. *Because the Plaintiff Refused to Show His Hands and Crawl Out of the Car K-9 Arlo Was Deployed But Came Back Out Without Biting The Plaintiff*

Because the Plaintiff refused to comply with orders to show both of his hands and come out of the car a decision was made to deploy K-9 Arlo in the car.  *See* Ex. A-6 at 16:10-29 [App. 079], Ex. C at ¶¶ 7-8 [App. 102], Ex. F at ¶¶ 12-13 [App. 111], Ex. H at ¶¶ 11-12 [App. 117-118], Ex. I at ¶¶ 10-11 [App. 122], Ex. J at ¶¶ 9-10 [App. 125-126].  Sergeant Cisneros explained he agreed with the decision to use K-9 Arlo because it was a safer option than deputies entering the trunk space.  *See* Ex. C at ¶ 8 [App. 102].  Sergeant Cisneros explained because deputies could not see the right arm and hand of the Plaintiff, and he was refusing to show it or come out this presented a high risk to deputies the Plaintiff was concealing a weapon in his right arm/hand or the area around him.  *Id.*, *see also* Ex. H at ¶ 11-12 [App. 117-118], Ex. I at 10-11 [App. 122].  For this reason, if K-9 Arlo encountered the Plaintiff first it would prevent risk to an officer and K-9 Arlo could more easily fit into the trunk and disarm the Plaintiff through a non-lethal bite. *Id.*  Corporal

Hastings was the K-9 handler for Arlo and he has testified when he entered the garage he could hear commands being yelled at the Plaintiff for him to come out with his hands up.  *See* Ex. A-8 at 1:00:50-1:03:30 [App. 081], Ex. K at ¶ 7 [App. 129-130].

Corporal Hastings testified he could see the Plaintiff's left hand to the wrist and the top of the Plaintiff's head but could not see the Plaintiff's right hand.  *Id.*  The Plaintiff refused to follow commands being given to show both of his hands, and Corporal Hastings did not know whether the Plaintiff had a weapon in the area around his right hand or the area around him that deputies could not see.  *Id.*  Corporal Hastings warned the Plaintiff if he did not comply with orders to show his hands he would send in the dog and he would bite.  *See* Ex. K at ¶ 8 [App. 130], Ex. A-8 at 1:00:50-1:03:30 [App. 081].  Because the Plaintiff continued not to comply with orders Corporal Hastings deployed K-9 Arlo; however, K-9 Arlo did not engage with the Plaintiff this time because he bypassed the open area of the trunk from the backseat.  *See* Ex. A-8 at 1:00:50-1:03:30 [App. 081], Ex. K at ¶ 9 [App. 130], At this time K-9 Arlo came back out of the vehicle without having bitten or engaged the Plaintiff.  *Id.*, *see also* Ex. C at ¶ 7 [App. 102], Ex. F at ¶ 13 [App. 111], Ex. H at ¶ 12 [App. 118], Ex. I at ¶ 11 [App. 122], Ex. J at ¶ 10 [App. 126].  Corporal Hastings removed K-9 Arlo and stood by the rear of the vehicle.  *See* Ex. K at ¶ 9 [App. 130].

### 9.  *The Plaintiff Refused to Comply With Additional Commands and K-9 Arlo Was Deployed A Second Time*

At this time additional commands were yelled at the Plaintiff for him to crawl out of the vehicle or the K-9 would be sent in again to apprehend him and would bite.  *See* Ex. A-7 at 1:00:50-1:03:30 [App. 080], Ex. A-8 at 32:00-32:16 [App. 081], Ex. C at ¶¶ 9-10 [App. 102-103], Ex. F at ¶ 14 [App. 111], Ex. at ¶ H at ¶ 13 [App. 118], Ex. I at ¶ 11 [App. 122], Ex. J at ¶ 11 [App. 126], Ex. K at ¶ 10 [App. 130].  Sergeant Cisneros has explained the failure of the Plaintiff to "show his hands or come out of the vehicle was dangerous because we did not know if he had a weapon in

his hands or was concealing a weapon with him in the trunk." *See* Ex. C at ¶ 9 [App. 102]. Because the Plaintiff continued to refuse to exit the vehicle or show his hands K-9 Arlo was sent in again. *See* Ex. A-8 at 1:00:50-1:03:30 [App. 081], Ex. C at ¶¶ 9-10 [App. 102-103], Ex. F at ¶ 14 [App. 111], Ex. at ¶ H at ¶ 13 [App. 118], Ex. I at ¶ 11 [App. 122], Ex. J at ¶ 11 [App. 126], Ex. K at ¶ 10 [App. 130]. Before Corporal Hastings sent in K-9 Arlo a second time he looked in the trunk area where the Plaintiff was hiding and confirmed he could see the Plaintiff's left hand to the wrist and the top of his head, but still could not see the Plaintiff's right hand to ensure he did not have any weapons. *See* Ex. K at ¶ 11 [App. 130]. The decision to deploy K-9 again was made due to the continued refusal of the Plaintiff to show both of his hands and exit the vehicle. *Id.*

On his second deployment in the trunk K-9 Arlo engaged the Plaintiff by biting his left forearm. *See* Ex. A-8 at 1:00:50-1:03:30 [App. 081], Ex. K at ¶ 12 [App. 130]. At this time Corporal Hastings ordered the Plaintiff to crawl out of the vehicle with his dog. *Id.*, Ex. A-8 at 32:45-33:20 [App. 081], *see also* Ex. J at ¶ 11 [App. 130]. This is a tactic taught in K-9 training for officer safety because officers still could not see the Plaintiff's hands or the area around him and did not know what weapons he had on his person. *Id.* If the Plaintiff crawled out of the vehicle with the K-9 it would prevent a situation where an officer went into an area they could not see and be shot or harmed. *Id.*

As reflected in the Court's Findings, Conclusions, and Recommendations approximately thirty seconds passed during which time K-9 Arlo was biting the Plaintiff in the trunk of the vehicle. *See* FCR (Doc. 96) at 6, Ex. A-7 at 1:02:02-10:03:26 [080], Ex. A-8 at 1:00:50-1:03:30 [App. 081].

### 10. *The Plaintiff Refused to Comply With Commands to Come Out of The Vehicle After Being Bitten*

Despite the commands to crawl out of the vehicle with the K-9 and show his hands the

Plaintiff continued to be non-compliant with commands. *See* Ex. C at ¶ 10 [App. 103], Ex. F at ¶ 14 [App. 111], Ex. H at ¶ 13 [App. 118], Ex. I at ¶ 11 [App. 122], Ex. J at ¶ 11 [App. 126], Ex. K at ¶ 12 [App. 130]. Because of the Plaintiff's non-compliance and the inability of deputies to see the Plaintiff's hands Corporal Hastings forcefully grabbed the shirt of the Plaintiff and pulled it and K-9 Arlo from the vehicle. *See* Ex. A-7 at 1:02:02-1:03:26 [App. 080], Ex. C at ¶ 10 [App. 103], Ex. F at ¶ 15 [App. 111], Ex. H at ¶ 14 [App. 118], Ex. I at ¶ 11 [App. 122], Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131]. The Plaintiff landed on his back when he came out of the car and was ordered to roll over on his stomach. *See* Ex. C at ¶ 10 [App. 103], Ex. F at ¶ 15 [App. 111], Ex. H at ¶ 14 [App. 118], Ex. I at ¶ 12 [App. 122], Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131]. Because the Plaintiff refused to follow the commands to roll over on his stomach and produce his hands to be handcuffed K-9 Arlo continued to bite and was not released. *See* Ex. C at ¶ 10 [App. 110], Ex. F at ¶ 15 [App. 111], Ex. H at ¶ 14 [App. 111], Ex. I at ¶ 12 [App. 122], Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131]. Additionally, the Plaintiff was kicking his legs during this time and Staff Sergeant Treharne had to assist in containing the legs of the Plaintiff as handcuffs were applied. *See* Ex. A-6 (Treharne BWC) 18:05-18:48 [App. 079], Ex. I at ¶ 12 [App. 122].

Once the Plaintiff was rolled over with officer assistance, Staff Sergeant Macias placed a handcuff on the Plaintiff's right wrist and Corporal Hastings released K-9 Arlo from the Plaintiff's left arm so that Staff Sergeant Macias could handcuff the Plaintiff's other arm. *See* Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131]. K-9 Arlo released his bite the moment before Staff Sergeant Macias grabbed for the left wrist of the Plaintiff. *See* Ex. K at ¶ 13 [App. 130-131]. K-9 Arlo did not continue to bite the Plaintiff at any point after handcuffs were applied. *See* Ex. A-6 at 18:05-48 [079], A-7 at 1:02:44-1:03:25 [App.080], A-8 at 33:26-34:15 [App. 081], Ex. C at ¶

10 [App. 103], Ex. F at ¶ 15 [App. 111], Ex. H at ¶ 14 [App. 118], Ex. I at ¶ 12 [App. 122], Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131].  After handcuffs were applied Staff Sergeant Macias searched the Plaintiff and with Staff Sergeant Treharne escorted the Plaintiff outside where he cut off his shirt to evaluate his injuries before turning him over to Lubbock EMS.  *See* Ex. I at ¶ 13 [App. 122-123], Ex. J at ¶ 12 [App. 126-127].  The Plaintiff was taken from the scene by ambulance to University Medical Center.  *See* Ex. D at ¶ 5 [App. 105].

The time period from the time the Plaintiff landed on his back until he was handcuffed during which time K-9 Arlo continued to bite the Plaintiff was very quick and lasted approximately forty-three seconds.  *See* FCR (Doc. 96) at 6, Ex. A-6 (Treharne BWC) 18:05-18:48 [App. 079], Ex. A-8 (Macias BWC) at 33:26-34:16 [App. 081]. As noted by the Magistrate Judge "in total, Arlo bit Salazar around one minute and twenty seconds[.]" *See* FCR (Doc. 96) at 6, Ex. A-7 (Hastings BWC) at 1:02:02-10:03:16 [App. 080].

### 11. *The Use of K-9 Arlo to Bite the Plaintiff Even After He Was On the Ground Was Necessary Because He Had Not Been Searched And Was A Risk to Deputies*

As explained by Corporal Hastings it was important for officer safety that K-9 Arlo remained engaged and continued to bite for the short period of time, less than a minute, it took deputies to get the Plaintiff to comply with commands to get on his belly and give his arms to be handcuffed.  *See* Ex. K at ¶ 14 [App. 131].  As he stated in his declaration:

> This was because we still did not know what weapons Mr. Salazar had on his person or intended to use against us and because he was not fully complying with commands to roll over and provide his arms to be handcuffed.  Mr. Salazar was continuing to kick his legs and Staff Sergeant Treharne had to restrain his legs.  Had the K-9 released his bite and the resistance of Mr. Salazar increased we would have had to resort to higher levels of force to get Mr. Salazar to comply with orders or we may have had to have the K-9 bite again which would have increased the injury to the suspect.  Additionally, we needed to have the left arm of Mr. Salazar unable to be used by him to grab for a weapon until we had completely restrained him due to the fact we did not know what weapons he had on his person or where those were located.

*See* Ex. K at ¶ 14 [App. 131].

The belief that it was necessary to have K-9 Arlo continue to bite for the short amount of time was shared by the other deputies in the garage during the use of force.  Sergeant Cisneros also believed the use of force was reasonable because deputies did not know what weapons the Plaintiff had on his person and the Plaintiff was "not fully complying with commands with commands to roll over and provide his arms to be handcuffed."  *See* Ex. C at ¶ 11 [App. 103].  Deputy Lidiak also believed the biting by K-9 Arlo was reasonable as he has provided declaration testimony stating:

> I was able to see the force that Cpl. Hastings was using with K-9 Arlo and believed that it was reasonable because of Mr. Salazar's non-compliance with orders, the danger faced by deputies who could not see the hands of Mr. Salazar or if he had another weapons hiding with him, and because it was a less harmful use of force than a firearm and because it was only deployed after multiple warnings were given to Mr. Salazar that a K-9 would be deployed if he continued to refuse to comply with commands.  The force was needed to obtain the compliance of Mr. Salazar up until the time he was placed in handcuffs.

*See* Ex. F at ¶ 16 [App. 111-112].

Similarly, Staff Sergeant Siegfried could see the force being used by Corporal Hastings and believed it was reasonable due to the Plaintiff's non-compliance with orders.  *See* Ex. H at ¶ 15 [App. 118-119].  He has stated "K-9 Arlo needed to continue to bite Mr. Salazar until he was completely controlled and restrained because we did not know what weapons Mr. Salazar had on his persons and he continued to refuse to comply with commands given to show both hands."  *Id*.  Staff Sergeant Treharne has also provided declaration testimony stating it was important for officer safety that K-9 Arlo remained engaged and continued to bite for the short period of time it took deputies to get the Plaintiff to comply with commands to get on his belly, stop kicking, and give his arms to be handcuffed.  *See* Ex. I at ¶ 13 [App. 122-123].  Staff Sergeant Macias, a K-9 handler

for six and half years and K-9 sergeant, has also provided declaration testimony explaining the continued biting of K-9 Arlo was necessary for officer safety. *See* Ex. J at ¶¶ 2, 13 [App. 124, 127]  Staff Sergeant Macias has explained it was necessary because "we still did not know what weapons Mr. Salazar had on his person or intended to use against us and because he was not fully complying with commands to roll over and provide his arms to be handcuffed." *See* Ex. J at ¶¶ 2, 13 [App. 124, 127].

### 12. *Deputies Delarosa, Jaramillo, and Uptain Were Not In the Garage and Did Not Witness the Use of Force*[1]

Although Deputy Uptain assisted in searching the residence for the Plaintiff he stayed in the hallway/bedroom after the conducting the search while other deputies went into the garage of the residence. *See* Ex. G at ¶ 6 [App. 114]. For that reason, Deputy Uptain did not ever enter the garage or observe the force being used in the garage to apprehend the Plaintiff. *Id*. at ¶ 8 [App. 114]. Deputy Uptain stayed in the hallway of the residence and not the garage so he did not observe any use of force that occurred in the garage and did not know K-9 Arlo had been deployed to get the Plaintiff out of the vehicle until after it had already occurred and the Plaintiff was in custody. *Id*.

Similarly, Deputy Jaramillo entered the residence and assisted with searching the residence but then remained in the kitchen of the residence as other deputies search the residence for the Plaintiff. *See* Ex. E at ¶ 7 [App. 107]. He overheard radio traffic indicating the Plaintiff was located the garage; however, he did not enter the garage when this happened and stayed in the

---

[1] On April 2, 2024 the Court ordered that Deputy Hastings, Sergeant Cisneros, Sergeant Delarosa, and Deputy Jaramillo be served and that Lubbock County identify the Doe Defendants who were in the garage on February 15, 2023 and who witnessed Corporal Hastings deployment of K-9 Arlo and Arlo biting the Plaintiff. *See* Order to Answer and Identify (Doc. 63), at 9. Lubbock County responded to the Court's Order on April 22, 2024 and identified Staff Sergeant Treharne, Staff Sergeant Treharne, Deputy Lidiak, Staff Sergeant Macias, and Deputy Uptain. *See* Lubbock County's Response to Court Order (Doc. 70) at 1. In the process of filing this Motion for Summary Judgment it has been discovered that Lubbock County incorrectly identified Deputy Uptain as having been in the garage when he was at the scene, but he was not in the garage and did not witness the use of force. *See* Ex. G at ¶¶ 6-8 [App. 114].

kitchen of the residence. *Id*. Deputy Jaramillo never entered the garage and did not observe the force being used in the garage to apprehend the Plaintiff. *See* Ex. E at ¶ 9 [App. 108]. Because he remained in the kitchen he was unable to intervene in any use of force that occurred in the garage. *Id*.

Likewise, Deputy Delarosa never entered any part of the home or garage at the location. *See* Ex. D at ¶ 4 [App. 104-105]. Deputy Delarosa's duties on February 15, 2023 were to act as perimeter security and to keep neighbors and members of the public away from the scene. *Id*. He had no role in determining if K-9 would be used in the operation and only learned about it after the fact. *Id*. Deputy Delarosa was not in the garage at the time of the Plaintiff's apprehension and did not have the ability to observe any force that was being used inside of the garage or the ability to intervene in any use of force. *See* Ex. D at ¶ 6 [App. 105].

| Deputies In The Garage | Deputies Not In The Garage |
|---|---|
| 1. Sgt. Joshua Cisneros, *see* Ex. C at ¶¶ 7-11 [App. 102-103]. | 1.  Jordan Uptain, *see*  Ex. G at ¶¶ 6-8 [App. 114]. |
| 2. Cole Lidiak, *see* Ex. F at ¶¶ 10-16 [App. 110-112]. | 2.  Joseph Jaramillo, *see* Ex. E at ¶¶ 7-9 [App. 107-108]. |
| 3. Sgt. Tracey Siegfried, *see* Ex. H at ¶¶ 10-15 [App. 117-119]. | 3.  Samuel Delarosa, *see* Ex. D at ¶¶ 4-6 [App. 104-105]. |
| 4. Sgt. Gregory Treharne, *see* Ex. I at ¶¶ 9-13 [App. 121-122]. | |
| 5. Sgt. Michael Macias, *see* Ex. J at ¶¶ 8-13 [App. 125-127]. | |
| 6. Stephen Hastings, *see* Ex. K at ¶¶ 6-14 [App. 129-131]. | |

## B. The Plaintiff Did Not Have Surgery And Only Received Sutures and Antibiotics for His Wounds

The Plaintiff was taken to University Medical Center on February 15, 2023 for his bite. *See* Ex. O (Medical Records) [App. 143, 164, 166, 167]. There he was prescribed antibiotics and records reflect he had deep lacerations on left forearm, most deep anteriorly, and superficial

lacerations posteriorly. *See* Ex. O [App. 166, 167]. Medical records further reflect that x-rays showed no foreign body or facture. *Id*. The medical records also reflect he was evaluated by an orthopedic resident and a CT scan of his left elbow was performed and it was normal. *Id*. The resident performed a three hour compartment check and because it was normal it was recommended to loosely close the wounds with sutures and prescribe a 10 day course of Augmentin. *Id*. The UMC emergency department provided discharge instructions to the Sheriff's Office as well as a prescription for Augmentin, instructions for wound care, and suture removal. *See* Ex. O [App. 169]. <u>Contrary to the Plaintiff's assertions in the *Spears* hearing and in his Amended Complaint, the Plaintiff did not have surgery for his injury and no ripped tendon is reflected in his medical records</u>. *See* Ex. O [App. 166-169], *see* Pl.'s Second Am. Compl. (Doc. 22) at 6 (alleging he underwent surgery and was hospitalized at UMC Trauma Center). Even prior to being sutured the Plaintiff was able to bend his elbow in photographs of his injuries. *See* Ex. A-2 (Photos) [App. 055-075]. The Plaintiff received sutures and antibiotics for his wounds. *See* Ex. O [App. 166, 167], Ex. B (Finley Decl.) at ¶ 9 [App. 084].

Once at the Lubbock County Detention Center the Plaintiff had a follow up visit with Nurse Practitioner Trujilo on February 17, 2023. *See* Ex. O [App. 170], *see also* Ex. B (Finley Decl.) at ¶ 10 [App. 084]. The Plaintiff refused to go to his scheduled follow up on February 21, 2023. *Id*. On February 22, 2023 during wound care the nurse noticed his left arm was very swollen, warm to the touch, and red. *Id*. Because of this the nurse notified the provider and the Plaintiff was taken to UMC due to possible concerns of an infection. *Id*. He was returned to the Lubbock County Detention Center that day with orders for antibiotics, Tylenol, ibuprofen, and to elevate arm to decrease swelling. *Id*. As of April 12, 2023, the Plaintiff was 33% non-compliant with his antibiotic and 50% non-compliant with his wound care. *See* Ex. B at ¶ 14 [App. 085].

On February 27, 2023 the Plaintiff had a follow up with Dr. Reddick who extended his antibiotic and noted improvement. *Id*. On February 28, 2023 the Plaintiff had his sutures removed. *Id*. <u>On February 28, 2023 the Plaintiff submitted an application to be a working inmate</u>. *See* Ex. B-3 (Working Inmate App. Feb. 28) [App. 089-093]. <u>This application twice asked "Do you currently have any medical conditions that would prevent you or limit job performance?"</u> *Id*. <u>Twice in response the Plaintiff answered 'no' to that question.</u> *Id*. This February 28, 2023 working inmate application was rejected due to the Plaintiff's classification status. *Id*., *see also* Ex. B (Finley Decl.) at ¶ 13 [App. 084]. The Plaintiff submitted another working inmate application on April 10, 2023 and again twice answering no to the question of it he had any medical conditions that would prevent him or limit his job performance. *See* Ex. B-4 (Working Inmate App. April 10, 2023) [App. 094-095]. <u>Despite the Plaintiff's allegations the injury has prevented him from working as a barber, in both working inmate applications the Plaintiff expressed a preference for working as a barber and stated he was qualified to work as a barber</u>. *Compare* Ex. B-3 [App. 089], B-4 [App. 094] *with* Pl.'s Second Am. Compl. (Doc. 22) at 4, ¶ VI (seeking damages and future wages alleging job requires both hands to work as a barber).

## IV.
### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record before the Court shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non–moving party. *Anderson,* 477 U.S. at 248. An actual controversy of fact exists only where both parties have submitted evidence of relevant contradictory facts. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)*;*

*Anderson*, 477 U.S. at 248.  In making its determination, the court must draw all *justifiable* inferences in favor of the non–moving party.  *Anderson*, 477 U.S. at 255 (emphasis added).

Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp.*, 477 U.S. at 325, the non–movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact.  Fed. R. Civ. P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).  Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

To defeat a properly supported motion for summary judgment, the non–movant must present more than a mere scintilla of evidence.  *See Anderson*, 477 U.S. at 251.  Rather, the non–movant must present sufficient evidence upon which a jury could reasonably find in the non–movant's favor.  *Id.*  Absent such a showing, a properly supported motion for summary judgment should be granted.  *See Eversley v. MBank Dall.*, 843 F.2d 172, 173–74 (5th Cir. 1988). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322–23.

If no factual showing is made in opposition to a motion for summary judgment, the district court is not required to search the record *sua sponte* for some genuine issue of material fact. In reviewing the summary judgment evidence, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  Rather, the Court

need rely only on those portions of the submitted documents to which the nonmoving party directs the Court's attention. *Id.*; *see also Forsyth v. Barr*, 19 F.3d 1527, 1536-37 (5th Cir. 1994) (finding that two volumes of summary judgment evidence were insufficient to preclude summary judgment when plaintiffs failed to identify specific portions which supported their claims). This is because Rule 56(e) of the Federal Rules of Civil Procedure requires the party against whom the motion is made to "set forth specific facts showing that there is a genuine issue for trial," and absent such a showing, a properly supported motion for summary judgment should be granted. *See Eversley v. MBank Dall.*, 843 F.2d 172, 173-74 (5th Cir. 1988); *Resol. Tr. Corp. v. Starkey*, 41 F.3d 1018, 1022-23 (5th Cir. 1995).

## V.
### STANDARD OF REVIEW—QUALIFIED IMMUNITY DEFENSE ALTERS THE SUMMARY JUDGMENT BURDEN OF PROOF

As noted recently by the Fifth Circuit, the clear message of the Supreme Court is that qualified immunity exists and should be granted to anyone "but the plainly incompetent or those who knowingly violate the law." *See Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (noting numerous reversals of the denial of qualified immunity by the Supreme Court and the importance of qualified immunity to society).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments[.]" *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting *Ashcroft v. Al–Kidd*, 563 U.S. 731 (2011)). "A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

## VI.
### THE PURPOSE OF QUALIFIED IMMUNITY & ITS WELL–KNOWN TEST

Qualified immunity serves a number of quite important goals.  Courts have expressed a concern over the deterrent effect that civil liability may have on the willingness of public officials to fully discharge their professional duties.  *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  A qualified immunity defense "serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." *See Thompson v. Upshur Cty.*, 245 F.3d 447, 456 (5th Cir. 2001); *see also Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (en banc) (discussing the important goals served by the qualified immunity doctrine).

To determine whether an official is entitled to qualified immunity, Courts conduct a two–step analysis.  *Saucier v. Katz*, 533 U.S. 194, 200–02 (2001).  First, they examine whether in viewing the facts the Plaintiff has alleged or shown a violation of a constitutional right under current law.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)*; Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999).  Second, if a violation occurred, the Court considers "whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Bailey v. Iles*, No. 22-30509, 2023 WL 8062239, at *2 (5th Cir. Nov. 21, 2023)(citing *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019)); *Hicks v. LeBlanc*, 81 F.4th 497, 503 n. 14 (5th Cir. 2023); *Baker v. Coburn*, 68 F.4th 240, 245 (5th Cir. 2023), as revised (May 19, 2023)(citing *Saucier v. Katz*, 533 U.S. 194, 200–01(2001).  "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's asserted constitutional or federal statutory right." *Weisshaus v. Teichelman*, 637 F.

Supp. 3d 434, 440 (N.D. Tex. 2022).  An officer is entitled to qualified immunity "if there is no violation, or if the conduct did not violate law clearly established at the time." *Bailey,* 2023 WL 8062239, at *2 (5th Cir. Nov. 21, 2023).  As noted by the Fifth Circuit the "clearly established inquiry is demanding," and existing precedent must "squarely govern[ ] the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Baker v. Coburn*, 68 F.4th 240, 245 (5th Cir. 2023), as revised (May 19, 2023).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *See Lytle v. Bexar Cty.*. 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier*, 533 U.S. at 202).

Recently, the Fifth Circuit explained that "the objective reasonableness of the defendant officers' conduct goes to the question of whether Baker's constitutional right against excessive force was violated, not the question of whether that right was clearly established." *Baker v. Coburn*, 68 F.4th 240, 251 n. 10 (5th Cir. 2023), as revised (May 19, 2023).  The Fifth Circuit has stated that the touchstone of whether a right at issue was clearly established is "fair warning: The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.' In other words, '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his [or her] conduct was unlawful in the situation he [or she] confronted.'" *Hicks v. LeBlanc*, 81 F.4th 497, 504 (5th Cir. 2023).

 "Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Weisshaus*

*v. Teichelman*, 637 F. Supp. 3d at 440 (citing *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (internal marks omitted)(Kacsmaryk, J.).   The denial of an official's motion for summary judgment predicated upon qualified immunity requires "two distinct determinations:  (1) 'a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law'; and (2) 'a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct.'" *Weisshaus*, 637 F. Supp. 3d at 440 (citing *Hogan v. Cunningham*, 722 F.3d 725, 730 (5th Cir. 2013)).

## VII.
### ARGUMENTS AND AUTHORITIES

**A.  The Court Should Review The K-9 Deployment and Bite Duration Claims Under the *Graham v. Connor* Factors As They Were Perceived By Corporal Hastings**

The Plaintiff's claims that survived screening against Corporal Hastings are for the 1) deployment of K-9 Arlo; and 2) the duration of K-9 Arlo's bite.  *See* FCR (Doc. 96) at 8, 10.  To prevail on an excessive force claim the Plaintiff must show " (1) an injury, (2) that resulted directly from an officer's use of force, and (3) that the force used was "objectively unreasonable." *Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021).  The second and third elements collapse into a single objective-reasonableness inquiry guided by the *Graham* factors articulated in *Graham v. Connor*, 490 U.S. 386, 396 (1989).  *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018).  The *Graham* factors include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempt to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Recently the Fifth Circuit noted "[a] court must measure the force used under the facts as a reasonable officer would *perceive* them, not necessarily against the historical facts." *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *6 (5th Cir. June 10, 2024)(citing

*Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016)).  Additionally, the Fifth Circuit noted the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396-97).  Moreover, as recognized by the Supreme Court the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. 386, 387 (1989).

**B. Based On Recent Fifth Circuit Precent The Deployment of K-9 Arlo and The Duration of The Bite Does Not Violate Clearly Established Law**

Recent Fifth Circuit caselaw makes clear Corporal Hastings is entitled to qualified immunity on both the K-9 deployment and the duration of bite claims.  *See Smith v. Lee*, 73 F.4th 376, 385 (5th Cir. 2023).  In *Smith v. Lee* officers entered a home searching for a suspect in a second-degree murder case accused of killing another man.  *Id.*  The officers believed the suspect was dangerous and hiding.  *Id.*  Based on this the Fifth Circuit held "[the officer's] decision to deploy [the dog] with the command to bite and hold the first person he found inside the house was reasonable."  *Smith,* 73 F.4th at 385.  In *Smith v. Lee*, instead of biting the suspect the dog bit a seventy-eight year old man who was sleeping at the time officers entered the home.  *Id.* at 380-81.  The duration of the bite to the innocent man lasted "at least a minute," and left him with puncture wounds and lacerations to this left thumb, left calf, and left thigh.  *Id.* at 380-81; 386.  In response to claims the duration of the dog bite was objectively unreasonable, the Fifth Circuit held the plaintiff failed to raise "a genuine, material fact issue that the law was so clear that no reasonable officer facing a similar situation would have acted as did Officer Lee." *Id.* at 385.  The Fifth Circuit granted the officer qualified immunity finding "[e]ven if Officer Lee mistakenly permitted Dice to bite Stewart for a minute, qualified immunity shields him from suit as well as liability."  *Id.* at 387.

The Fifth Circuit held that "no precedent establishes under analogous circumstances how long a bite is too long." *Id*. In the case at hand the Plaintiff suffered much less severe injuries than the innocent person in *Smith v. Lee* suffered. *See* Ex. O [App. 166-169], Ex. B at ¶ 9 [App. 084] (reflecting the Plaintiff received lacerations treated with sutures and antibiotics).

Because summary judgment evidence establishes: (1) deputies were serving felony warrants on the plaintiff; (2) the plaintiff hid from deputies; (3) the plaintiff refused to show his hands or exit the vehicle; and (4) the plaintiff posed a threat to officers the Fifth Circuit precent establishes Corporal Hastings' actions were objectively reasonable such that he is entitled to qualified immunity on both the K-9 deployment and duration of bite claims. *See Smith v. Lee*, 73 F.4th 376, 385-87 (5th Cir. 2023); *see also* §§ III A-B (Background Facts), *supra*.

### 1. *The Severity of the Crime At Issue Renders The K-9 Deployment and Bite Duration Reasonable Under Graham*

As recognized by the Findings, Conclusions, and Recommendations adopted by this Court the first *Graham* factor concerning the severity of the crime at issue weighs in favor of Corporal Hastings because the deputies entered the Plaintiff's "family home to serve at least two felony warrants for evading arrest with a vehicle and unauthorized use of a motor vehicle—serious offenses." *See* FCR (Doc. 96) at 6. Additionally, as cited to within the FCR "the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021); *see also Hinson v. Martin*, 853 F. App'x 926, 927-931(5th Cir. 2021)(holding in the *Graham* factor context an arrestee wanted on a felony arrest warrant for armed robbery involving a firearm was a serious offense). The felony warrants the Plaintiff was being arrested on were for Evading Arrest/Detention with a Vehicle a third-degree felony, Unauthorized Use of A Motor Vehicle a state jail felony, as well as two misdemeanor warrants for theft and criminal mischief.

*See* Ex. A-1 at [App. 008, 09]; Ex. E at ¶ 3 [App. 106]; Ex. F at ¶ 4 [App. 109-110]; Ex. H at ¶ 4 [App. 116]. The Fifth Circuit has held that felony evading arrest with a vehicle is a serious crime that weighs against a finding of excessive force. *Salazar v. Molina*, 37 F.4th 278, 281–82 (5th Cir. 2022)(finding felony evading arrest with a vehicle to be a serious crime for purpose of the *Graham* factors).

Moreover, the conduct of the Plaintiff in hiding from deputies constituted the new offense of evading arrest or detention a crime for which the Plaintiff was charged; however, charges were dismissed when the Plaintiff was convicted on a higher felony level offense. *See* Ex. L (Evading Information and Dismissal) [App. 132-133], Ex. M (Judgment) [App. 137-139]. Because the Plaintiff was being arrested on felony warrants and because of his actions in evading deputies the first *Graham* factor concerning the severity of the crime weighs in favor of Corporal Hastings and renders his decision to deploy K-9 Arlo and the duration of the bite reasonable.

### 2. *The Second Graham Factor Weighs In Favor of Corporal Hastings And Renders His K-9 Deployment Reasonable Under the Circumstances*

As detailed in the background facts, the immediate threat posed to deputies on the scene and in the garage on February 15, 2023 by the Plaintiff causes the second *Graham* factor to weigh in favor of Corporal Hastings. Moreover, his conduct in deploying K-9 Arlo into the vehicle to apprehend the Plaintiff squares with numerous Fifth Circuit cases which support the reasonableness of the deployment of K-9 to apprehend a hiding or fleeing suspect, especially in situations where officers cannot see the suspect's hands.

In *Hinson v. Martin*, the Fifth Circuit found the second *Graham* factor weighed in favor of an officer that deployed a K-9 when the plaintiff was "suspected of a violent felony involving a firearm, was presumed to be armed and dangerous, and was fleeing through a wooded area where officers could not see him." *Hinson v. Martin*, 853 F. App'x 926, 931 (5th Cir. 2021). In *Hinson*

the Fifth Circuit noted the officer reasonably believed he was chasing an "armed and dangerous fugitive suspected of a violent felony through a wooded area" and because of this the officer "had adequate cause to believe [the plaintiff] posed a substantial threat to himself, his fellow officers, and bystanders." *Id.* Consequently, the Fifth Circuit held the second *Graham* factor weighed in favor of the officer and his deployment of the K-9. *Id.*

Similarly, in *Smith v. Lee* when officers believed the murder suspect was hiding from them the Fifth Circuit held, "[g]iven the apparent danger of this suspect and situation, Lee's decision to deploy Dice with the command to bite and hold the first person he found inside the house was reasonable." *Smith*, 73 F.4th at 385. Finally, in *Shumpert v. City of Tupelo*, the Fifth Circuit upheld the district court's determination an officer was entitled to qualified immunity when he deployed a K-9 to pursue a suspect that fled from a traffic stop and was hiding under the crawl space of a home. *Shumpert v. City of Tupelo*, 905 F.3d 310, 315 (5th Cir. 2018), as revised (Sept. 25, 2018). In *Shumpert*, the K-9 Officer opened the door to the crawl space and commanded the fleeing suspect to come out; however, the suspect ran further under the house prompting the K-9 officer to release his dog which then bit the suspect. *Id.* The Fifth Circuit found the officer's deployment of the K-9 did not violate clearly established law because the suspect ignored the officer's instructions and retreated further under the home, preventing the officer from determining whether he was armed. *Id.* at 323. Consequently, the Fifth Circuit held because the suspect was violently resisting arrest and the officer did not know whether he was armed, the officer's use of K-9 force was not objectively unreasonable in light of clearly established law. *Id.*

Caselaw also supports that suspects who are hiding present a threat to officers when officers cannot determine if they are armed. In *Woodard v. Carol*, deputies were actively looking for a plaintiff evading arrest on outstanding warrants and when they located him he fled on foot

into a wooded area. *Woodard v. Carol*, 630 F. Supp. 3d 806, 811 (W.D. La. 2022). For this reason, a dog was used to locate the plaintiff where he was hiding with his hands obscured. *Id*. The plaintiff did not comply with deputies' verbal commands to show his hands and come out so the dog was ordered to bite and continued to do so until the plaintiff was fully handcuffed. *Id*. The district court in *Woodard* found the deputy defendants did not use excessive force because the plaintiff's hands were hidden in the wooded area, he was not compliant with deputy defendants' commands and because deputies could not be certain whether he had a weapon near him when the dog was engaged. *Id*. at 816. Concerning the second *Graham* factor the district court held the plaintiff posed "an 'immediate threat to the safety of the officers[,]'" because "plaintiff was hidden in an area that presented dangerous circumstances due to low visibility." *Id.* at 817.

In analogous facts to the case at hand, in *Baker v. Cohen*, the Southern District of Florida held the release of a police dog to bite, seize, hold, and remove a suspect from a vehicle he was found hiding in did not constitute excessive force after the suspect had fled the scene of an initial traffic stop, engaged in a high speed chase, and police officers could not see his hands and did not know whether he was armed. *Baker v. Cohen*, 2010 WL 3385266, at *12 (S.D. Fla. Aug. 5, 2010); *see also Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1317 (10th Cir. 2009)(holding that release of police dog did not constitute unconstitutional excessive force where suspect had threatened his wife, was armed, and hiding in the residential neighborhood in the middle of the night); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003)(holding release of police dog to bite and hold suspect was not unreasonable under second *Graham* factor where officer could not discern whether suspect was armed given the limited visibility).

In analyzing the second *Graham* factor of the threat to officers the Fifth Circuit has also instructed courts that even if a suspect appears to be surrendering "what preceded the surrender

matters." *Salazar v. Molina*, 37 F.4th 278, 282 (5th Cir. 2022), cert. denied, 143 S. Ct. 1781 (2023)(reversing and rendering for deputy defendant).  In *Salazar v. Molina*, a tasing case, a plaintiff led police on a high-speed chase and after stopping his vehicle he got out and laid on the ground; however, he uncrossed his legs right before an officer reached him causing the officer to tase him.  *Salazar*, 37 F.4th at 280.  In analyzing the second *Graham* factor the Fifth Circuit stated "when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a ploy. That's especially true when a suspect is unrestrained, in close proximity to the officers, and potentially in possession of a weapon." *Id*.  In *Salazar*, the Fifth Circuit held the plaintiff failed to show the officer who tased him violated his rights, and that even if the officer violated his rights the officer would nonetheless be entitled to qualified immunity.  *Id*. at 284; *see also Henderson v. Harris Cnty., Tex.*, 51 F.4th 125, 135 (5th Cir. 2022)(noting a suspect cannot refuse to surrender and instead lead police on a pursuit and then appear to surrender and receive the same Fourth Amendment protection from intermediate force he would have received had he promptly surrendered in the first place); *see also Escobar v. Montee*, 895 F.3d 387 (5th Cir. 2018).

Caselaw also supports the reasonableness of a K-9 deployment when officers are aware a suspect is "both violent and potentially armed." *Carpenter v. Itawamba Co. Jail*, 597 F. Supp. 3d 977, 994–95 (N.D. Miss. 2022).  In *Carpenter*, deputies were granted qualified immunity on excessive force claims related to their deployment of K-9 to apprehend a suspected murder and continue to subdue him until he was handcuffed.  *Id*. at 995-96.  There, the district court noted concerning the second *Graham* factor "all responding officers were aware that Carpenter was both violent and potentially armed." *Id*. at 994.  Additionally, the plaintiff in *Carpenter* had absconded into a wooded area behind his home and ignored "repeated announcements of police and K-9

presence and commands to get on the ground or put his hands up, Carpenter still acted in an aggressive manner, threatened the Deputies, backing up." *Id.* at 995. For that reason, the district court noted "any reasonable officer could have perceived Carpenter to be an immediate threat to the deputies." *Id.*

Consistent with the facts of the cases discussed above involving suspects who have hidden from officers, fled from officers, and are known to be violent and whose hands officers cannot see the second *Graham* factor concerning the immediate threat posed to the safety officers weighs in favor of Corporal Hastings. *See* §§ III A-B (Background Facts), *supra*. In the case *sub judice* Corporal Hastings and all the deputies on scene knew the Plaintiff was a gang member with a violent criminal history. *See* Ex. C at ¶¶ 4-5 [App. 101-102]; Ex. E at ¶¶ 3-4 at [App. 106-107]; Ex. F at ¶¶ 4-5 [App. 109-110]; Ex. H at ¶¶ 4-5 [App. 116-117]; Ex. I at ¶¶ 4-5 [App. 120-121]; Ex. K at ¶ 4 [App. 139]. Additionally, the Plaintiff had run into his house when law enforcement attempted to apprehend him and remained hidden from law enforcement through loud announcements and the searching of two K-9s. *See* Ex. C at ¶ 6 [App. 102]. Additionally, once the deputies located him in the trunk of the car he refused to comply with orders to show both of his hands and come out of the car and deputies could not see both of his hands to know if he was armed. *See* Ex. C at ¶¶ 7-8 [App. 102], Ex. F at ¶¶ 12-13 [App. 111], Ex. H at ¶¶ 11-12 [App. 117-118], Ex. I at ¶¶ 10-11 [App. 122], Ex. J at ¶¶ 9-10 [App. 125-126]. Deputies, including Corporal Hastings, believed because they could not see the right hand of the Plaintiff and he was refusing to show it or come out this presented a high risk to deputies he was concealing a weapon. *See* Ex. C at ¶ 8, Ex. H at ¶ 11-12 [App. 102], Ex. I at 10-11 [App. 122], Ex. K at ¶ 7 [App. 129-130]. Corporal Hastings has provided declaration testimony stating:

> Mr. Salazar was hiding concealed in the vehicle's trunk area and was refusing to comply with the commands being given by SWAT deputies to come out of the

vehicle and to show his hands. When I approached the vehicle with K-9 Arlo I
could see Mr. Salazar's left hand to the wrist and the top of his head but could not
see his right hand. Mr. Salazar refused to follow commands being given to show
both of his hands. I did not know whether Mr. Salazar had a weapon in his right
hand or if he was concealing a weapon in the area around his right hand or the area
around him that he intended to use with the hand we could not see. His actions
presented an immediate danger to officers that were all within a close range of Mr.
Salazar. This is especially true given the fact he had just engaged in a standoff with
officers, refusing to come out as they attempted to execute felony warrants.

*See* Ex. K at ¶ 7 [App. 129-130].

Based on the analogous facts of the Fifth Circuit precedent and other caselaw discussed
herein the second *Graham* factor concerning the immediate threat to officers posed by the Plaintiff
weighs in favor of Corporal Hastings because of: (1) the officers knowledge of the plaintiff's
criminal history, (2) the presence of the officers to serve felony warrants; (3) the conduct of the
plaintiff in evading officers and hiding from them in a car in the garage; (4) the plaintiff's refusal
to follow commands to show both of his hands and exit the vehicle; and (5) the inability of officers
to see both of the Plaintiff's hands.  *See* §§ III A-B (Background Facts), *supra*.

### 3. *The Second Graham Factor Concerning The Immediate Threat To Officer Safety Also Weighs in Favor of Corporal Hastings When Considering the Bite Duration*

In considering the circumstances and the second *Graham* factor of the immediate threat to
officer safety against the duration of the bite to the Plaintiff until he was fully handcuffed, the bite
duration does not violate clearly established law.

As detailed above and herein the actions of the Plaintiff in hiding from deputies, refusing
to show both his hands, and refusing to comply with orders placed all deputies in danger.  *See* Ex.
C at ¶¶ 7-9 [App. 102], *See* Ex. H at ¶ 11 [App. 117-118].  However, <u>the threat to officer safety
did not end when the Plaintiff was removed from the vehicle and landed on the ground because at
that point the Plaintiff refused to follow commands to roll over on this stomach and produce his
hands to be handcuffed.</u> *See* Ex. C at ¶ 10 [App. 103], Ex. F at ¶ 15 [App. 111], Ex. H at ¶ 14 [App.

118], Ex. I at ¶ 12 [App. 122], Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131].

Additionally, the Plaintiff kicked his legs during this time and Staff Sergeant Treharne had to assist

in containing his legs. *See* Ex. I at ¶ 12 [App. 122], Ex. A-6 (Treharne BWC) 18:05-18:48 [App.

079]. As explained by Sergeant Macias, a K-9 handler with six and half years of experience and

K-9 Sergeant:

> It was important for officer safety that K-9 Arlo remained engaged and continued
> to bite for the short period of time, less than a minute, it took officers to get Mr.
> Salazar to comply with commands to get on his belly and give his arms to be
> handcuffed. This was because we still did not know what weapons Mr. Salazar
> had on his person or intended to use against us and because he was not fully
> complying with commands to roll over and provide his arms to be handcuffed. Had
> the K-9 released his bite and the resistance of Mr. Salazar increased we would have
> to resort to higher levels of force to get Mr. Salazar to comply with orders or we
> may have had to have the K-9 bite again which would have increased the injury to
> the suspect.

*See* Ex. J at ¶ 13 [App. 127].

These officer safety considerations are reasonable and supported by caselaw especially

given the short time frame of the bite. As detailed in the FCR, video footage shows that Arlo bit

and held the Plaintiff's arm for approximately one minute and twenty seconds total. *See* FCR

(Doc. 96) at 9, Ex. A-7 at 1:02:02-1:03:26 [App. 080]. This time period can be broken down into

smaller pieces because about thirty seconds after Arlo first bit the Plaintiff he emerged on the

ground. *See* FCR (Doc. 96) at 9, Ex. A-6 at 18:05-48 [App. 079], Ex. A-7 at 1:02:02-1:03:26

[App. 080], Ex. A-8 at 33:26-34:14 [App. 081]. Then, as reflected in the FCR, approximately

"fourteen seconds elapsed between Salazar rolling onto his stomach and Arlo releasing the bite."

*Id.,* Ex. A-7 at 1:03:11-25 [App.080]. The FCR also reflects from the time the Plaintiff emerged

from the car and landed on the ground approximately forty-three seconds passed until the Plaintiff

was handcuffed. *See* FCR (Doc. 96) at 6, Ex. A-7 at 1:02:02-1:03:26 [App. 080], Ex. A-8 at 32:45-

34:15 [App. 081]. <u>The Plaintiff does not contend, and the video does not reflect that Arlo bit the</u>

Plaintiff at any point after he was handcuffed. *See* FCR (Doc. 96) at 9, Ex. A-6 at 18:05-48 [App. 079], Ex. A-7 at 1:02:44-1:03:25 [App.080], Ex. A-8 at 33:26-34:14 [App. 081].

Given the circumstances a bite of this duration is reasonable under existing Fifth Circuit precedent.   As detailed above in *Smith v. Lee*, instead of biting the suspect the dog bit a seventy-eight year old man who was sleeping at the time officers entered the home.  *Smith v. Lee,* 73 F.4th at 380-81.  The duration of the bite to the innocent man lasted "at least a minute," and left him with puncture wounds and lacerations to this left thumb, left calf, and left thigh.  *Id.* at 380-81; 386.  In response to an argument the duration of the dog bite was objectively unreasonable the Fifth Circuit held the plaintiff failed to raise a "a genuine, material fact issue that the law was so clear that no reasonable officer facing a similar situation would have acted as did Officer Lee." *Smith v. Lee*, 73 F.4th 376, 385 (5th Cir. 2023).

Courts have also held in similar situations it is reasonable to have a K-9 remain engaged and biting until such time as the suspect is handcuffed.  In a similar unreasonable bite duration claim in *Escobar v. Montee*, a suspect, Escobar, assaulted his wife and fled from police with a knife.  *Escobar v. Montee*, 895 F.3d 387, 390 (5th Cir. 2018).  While chasing him police were informed by his mother they would have to kill him to get him.  *Id*.  Officer Montee and his dog found the suspect in a backyard where the suspect claimed he dropped the knife he was holding and laid flat on the ground.  *Id.* at 390-91.  The suspect was bitten by the dog and the officer allowed the dog to continue biting Escobar until he was fully subdued and in handcuffs, in total a bite lasting approximately one minute.  *Id.* at 391. In *Escobar* the Fifth Circuit reversed the district court's denial of qualified immunity for Officer Montee on the continued bite claim finding the totality of the circumstances and the *Graham* factors established the continued biting of the dog until such time as the suspect was handcuffed was not objectively unreasonable.  *Id*. at 396.  In

doing so the Fifth Circuit noted the second *Graham* factor—whether Escobar posed a threat was the focus of the dispute and reversed the district court, holding it was reasonable for officers to believe Escobar posed them a threat. *Id.* The circumstances the Fifth Circuit pointed to were that: 1) the knife remained in the suspect's reach; 2) he had just committed a felony; 3) the chase was at night; 4) the suspect fled into the night through multiple backyards; 5) the suspect had hidden from the police for twenty minutes; and 5) the warnings from the suspect's mother he would not be taken alive. *Id.* at 394.

In *Escobar*, the Fifth Circuit relied upon the Eleventh Circuit's decision in *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009). As recited by the Fifth Circuit in *Crenshaw*:

> An officer responded to reports of possibly two armed robberies; after a chase, the suspect abandoned his vehicle and fled into the woods. The suspect then yelled his location and intent to surrender, but the officer released a canine without warning. And despite screams of pain, the officer did not remove the canine until the suspect was handcuffed. Yet the court held that the officer's use of force was not excessive. *Id.* at 1292. The officer had reason to believe that the suspect of an armed robbery was armed and, given the nature of the flight and location in the woods, "it was objectively reasonable for [the officer] to question the sincerity" of the surrender. *Id.* at 1293. Moreover, although the suspect was not actively resisting while being handcuffed, the officer was not required to call off the dog until the suspect was secured because he "had no reason to trust that [the suspect] would not suddenly attempt to do him harm."

*Escobar v. Montee*, 895 F.3d 387, 395 (5th Cir. 2018)(citing *Crenshaw*, 556 F.3d at 1292-93).

Likewise, in *Woodard v. Carol*, the district court held it reasonable both to deploy a dog to apprehend a suspect and to allow a dog to continue subduing the suspect until he was handcuffed because the suspect had been otherwise unwilling to submit to arrest and officers could not know whether the suspect had weapons. *Woodard v. Carol*, 630 F. Supp. 3d 806, 818 (W.D. La. 2022).

Similar to the officer in *Escobar*, in the case *sub judice* the Plaintiff (i) fled from deputies, (ii) hid from deputies, and (iii) refused to follow their commands. *See* §§ III A-B (Background Facts), *supra*. After he was on the ground Corporal Hastings still did not know if he had weapons on him

and the Plaintiff continued to resist by failing to roll over on his stomach and produce both hands

to be handcuffed. *Id.* For these reasons, consistent with *Escobar v. Montee*, *Crenshaw v. Lister*,

and *Woodard v. Carol* the actions of Corporal Hastings in continuing to have K-9 Arlo subdue the

Plaintiff until he was handcuffed was objectively reasonable because the second *Graham* factor

concerning the threat posed to officers weighs in favor of Corporal Hastings.

### 4. *The Plaintiff's Active Resistance Renders the Deployment And Bite Duration Reasonable*

In considering the circumstances and the third *Graham* factor concerning the Plaintiff's

active resistance or attempts to evade arrest by flight, again the actions of the Plaintiff and the

circumstances cause this action again weighs in favor of Corporal Hastings and support the

reasonableness of his decision to deploy K-9 Arlo and to continue to have Arlo subdue the Plaintiff

until he was fully handcuffed.

Competent summary judgment evidence establishes that prior to locating the Plaintiff

hiding in the trunk of the vehicle he was given multiple warnings he needed to come out of hiding

or a dog would be sent in to find him and it would bite. *See* Ex. C at ¶ 7 [App. 102], Ex. F at ¶ 10

[App. 110-111], Ex. H at ¶¶ 9-10 [App. 117], Ex. J at ¶ 7 [App. 125], Ex. I at ¶¶ 8-9 [App. 121],

Ex. K at ¶ 7 [App.129-130]. These warnings were given by deputies prior to deputies entering the

residence, prior to deputies entering the garage, and again when deputies entered the garage. *Id.*

As reflected in the FCR when deputies entered the garage and located the Plaintiff in the

vehicle's trunk they gave orders for the Plaintiff to show both of his hands and get out of the car

or they would send the dog into the trunk. *See* FCR (Doc. 96) at 6, Ex. A-6 at 16:00-17:00 [App.

079], Ex. A-7 at 1:00:50-1:00:55 [App. 080], Ex. A-8 at 29:10-31:40 [App. 081], Ex. C at ¶¶ 7-8

[App. 102], Ex. F at ¶¶ 12-13 [App. 111], Ex. H at ¶¶ 11-12 [App. 117-118], Ex. I at ¶¶ 10-11

[App. 122], Ex. J at ¶¶ 9-10 [App. 125-126], Ex. K at ¶ 8 [App. 130]. Because the Plaintiff did

not obey these orders Corporal Hastings deployed K-9 Arlo into the vehicle the first time and K-9 Arlo did not bite the Plaintiff. *See* Ex. A-7 at 1:00:55-1:01:30 [App. 080]. Before K-9 Arlo was deployed for a second time the Plaintiff was given additional warnings to show both of his hands and come out of the car or deputies would put the dog back in the car unless the Plaintiff crawled out of the trunk. *See* Ex. A-7 at 1:01:25-33 [App. 080].  The FCR notes one deputy told the Plaintiff it was his last warning.  *See* Ex. A-7 at 1:01:25-33 [App. 080], Ex. A-8 at 32:00-15 [App. 081].

This failure of the Plaintiff to show both of his hands and come out of the vehicle constitutes active resistance because he actively resisted the deputies instructions and posed an immediate threat to the safety of officers who could not see if he had a weapon.  In *Woodard v. Carol*, the district court noted that the plaintiff "by hiding from the officers in tall, thick grass where his hands and surroundings could not clearly be seen and by failing to comply with orders, 'actively resist[ed]' the officers' instructions and posed an "immediate threat to the safety of the officers."" *Woodard*, 630 F. Supp. at 817-818.  In *Poole v. City of Shreveport*, the Fifth Circuit found the force used by officers in arresting a suspect was not objectively excessively or clearly unreasonable when an officer repeatedly commanded the arrestee to "turn around and give up his right arm," and the arrestee did not do so.  *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012).   There, the Fifth Circuit characterized the arrestee's resistance as "immediate and persistent."   *Id*.  In *Poole* the officers use of force was held to be objectively reasonable because in a tense and rapidly evolving situation they first commanded the arrestee to turn around and give up his right arm before resorting to physical force and then using a taser.  *Id*.  Similar to the suspects in *Woodard* and *Poole*, because the Plaintiff here actively resisted the deputies' commands and presented a threat to officers the third *Graham* factor weighs in favor of Corporal Hastings and supports the reasonableness of his decision to deploy K-9 to apprehend the Plaintiff.

According to deputies in the garage that observed the use of force, once the Plaintiff was on the ground he also continued to actively resist the orders of deputies to roll over on his belly and produce both of his hands to officers to be handcuffed.   *See* Ex. C at ¶ 10 [App. 103], Ex. F at ¶ 15 [App. 111], Ex. H at ¶ 14 [App. 118], Ex. I at ¶ 12 [App. 122], Ex. J at ¶ 12 [App. 126-127], Ex. K at ¶ 13 [App. 130-131].  Additionally, during this time the Plaintiff kicked his legs and Staff Sergeant Treharne had to assist in containing the legs of the Plaintiff as handcuffs were applied.  *See* Ex. A-6 (Treharne BWC) 18:05-18:48 [App. 079], Ex. I at ¶ 12 [App. 122].  Again, by failing to comply with the orders of deputies to roll over on his stomach, produce both hands to be handcuffed, and by kicking the Plaintiff actively resisted officers.   *See Woodard*, 630 F. Supp. 3d at 818 (noting that failing to comply with the orders of officers is active resistance); *Griggs v. Brewer*, 841 F.3d 308, 314 (5th Cir. 2016)(noting that lurching to the side and stating "no, no" in the act of being handcuffed immediately following a command to put your hands behind your back would amount to resistance to a reasonable officer).

Because of the Plaintiff's continued active resistance even after being removed from the vehicle in refusing to roll over, kicking his legs, and failing to provide both arms to be handcuffed the third *Graham* factor weighs in favor of Corporal Hastings and the reasonableness of his decision to utilize Arlo to subdue the Plaintiff until he was completely handcuffed.  *See Escobar v. Montee*, 895 F.3d at 396 (noting the third *Graham* factor largely folds into the second and that if Escobar may have posed a threat, then he also might have attempted to flee once released by the dog rendering the continued bite objectively reasonable.)

## VIII.

### THE BYSTANDER LIABILITY CLAIM AGAINST DEPUTIES CISNEROS, LIDIAK, SIEGFRIED, TREHARNE, AND MACIAS SHOULD BE DISMISSED

### A. The Bystander Liability Claims Against The Deputies In The Garage Should Be Dismissed

In an excessive force case brought by an arrestee, a claim under § 1983 based on bystander liability cannot prevail if the Plaintiff is unable to establish another officer's use of excessive force. Under the theory of bystander liability, deputies Cisneros, Lidiak, Siegfried, Treharne, and Macias can only be held liable if they failed to take reasonable measures to protect the Plaintiff from another officer's use of excessive force. *Woodard*, 630 F. Supp. 3d at 820. Because the actions of Corporal Hastings in deploying K-9 Arlo to apprehend and subdue the Plaintiff, until he could be fully handcuffed, was a reasonable use of force and does not violate the Plaintiff's constitutional rights these deputies "cannot be held liable as bystanders as there was no reason for them to intervene in a situation where the force being used was reasonable." *Woodard*, 630 F. Supp. 3d at 820. Accordingly, the Court should dismiss the claims against Deputies Cisneros, Lidiak, Siegfried, Treharne, and Macias because the Plaintiff cannot establish that Corporal Hastings used excessive force.[2]

Therefore, Deputies Cisneros, Lidiak, Siegfried, Treharne, and Macias are entitled to qualified immunity and summary judgment because the Plaintiff is unable to show that their conduct violated clearly established law at the time of the incident. *See Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020).

### B. The Standard for Reviewing Bystander Liability Claims

In the Fifth Circuit, officers may be held liable under Section 1983 under a theory of bystander liability when the officer: (1) knew a fellow officer was violating an individual's

---

[2] *See* discussion *infra,* Part VII Sections A-B.

constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act. *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020). Deputies Cisneros, Lidiak, Siegfried, Treharne, and Macias meet none of these elements because although they were present during the use of force, there was no constitutional violation and to the extent that there was an alleged violation of the Plaintiff's constitutional rights by another officer they did not observe any constitutional violations and all of them believed the decision to use K-9 Arlo to apprehend the Plaintiff and subdue the Plaintiff until he was compliant was reasonable.

Sergeant Cisneros, a deputy with eleven years of service of and a Master Peace Officer's license, has provided declaration testimony explaining:

> I agreed with the decision to use K-9 Arlo because it was a safer option than officers entering the trunk space. We could not see the right arm and hand of Mr. Salazar and he was refusing to show it or come out. This presented a high risk to officers that he was concealing a weapon in his right arm/hand or in the area around him. If K-9 Arlo encountered Mr. Salazar first it would prevent risk to an officer if that were the case and K-9 Arlo could more easily fit into the trunk and disarm Mr. Salazar through a non-lethal bite. The actions of Mr. Salazar in refusing to show both of his hands or exit the vehicle created a very dangerous situation for officers.

*See* Ex. C at ¶¶ 2, 8 [App. 101, 102].

Deputy Lidiak, also a seasoned law enforcement officer with thirteen years of service and a Master Peace Officer's license, has also opined he believed the deployment of K-9 Arlo to apprehend the Plaintiff was reasonable under the circumstances. *See* Ex. F at ¶¶ 2, 16 [App. 109, 111-112]. Similarly, Staff Sgt. Siegfried, also an experienced law enforcement officer with eleven years of service and a Master Peace Officer's license, has provided declaration testimony explaining that due to the Plaintiff's failure to comply with orders to crawl out of the vehicle and show his hands utilizing K-9 Arlo was the safest option for officer safety to apprehend the Plaintiff. *See* Ex. H at ¶¶ 2, 11 [App. 116, 117-118]. Staff Sgt. Treharne similarly holds a Master Peace

Officer license and has thirteen years of experience. *See* Ex. I at ¶ 2 [App. 120]. Sgt. Treharne has also explained his belief that the deployment of K-9 Arlo to apprehend the Plaintiff was reasonable because of the high risk to officers the Plaintiff was hiding or concealing a weapon based on his failure to comply with instructions. *See* Ex. I at ¶¶ 10-11 [App. 122]. Finally, Staff Sgt. Macias a peace officer with twenty years of experience, six and half years of experience as a K-9 handler, and five years as a K-9 Sergeant, has also provided declaration testimony explaining K-9 Arlo was sent into apprehend the Plaintiff because "as law enforcement officers we still had yet to see both of Mr. Salazar's hands to determine if he had a weapon in them he intended to use or if he was armed or hiding other weapons in the vehicle or on his person that could be a danger to us." *See* Ex. J at ¶¶ 2, 11 [App. 124,126].

These veteran law enforcement professionals have also opined the duration of K-9 Arlo's bite was reasonable and necessary based on the Plaintiff's failure to roll over on his stomach, provide both of his hands to be handcuffed, and because of his kicking of his legs after he was on the ground. *See* Ex. C at ¶¶ 2, 10-11 [App. 101, 103], Ex. F at ¶ 15-16 [App. 111-112], Ex. H at ¶¶ 14-15 [App 118-119], Ex. I at ¶¶ 2, 12-13 [App. 120, 122-123], Ex. J at ¶¶ 2, 12-13 [App. 124, 126-127]. Sgt. Cisneros has provided declaration testimony explaining it was important for officer safety K-9 Arlo remained engaged and continued to bite because the Plaintiff was not complying and officers did not know what weapons he had on his person. *See* Ex. C at ¶ 11 [App. 103]. Likewise, Deputy Lidiak has opined the force was needed to obtain compliance of the Plaintiff up until the time he was placed in handcuffs. *See* Ex. F at ¶¶ 2, 15-16 [App. 109, 111-112]. Sgt. Siegfried articulated the reasonableness of the duration of the bite stating, "K-9 Arlo needed to continue to bite Mr. Salazar until he was completely controlled and restrained because we did not know what weapons Mr. Salazar had on his person and he continued to refuse to comply with

commands given to show both hands." *See* Ex. H at ¶ 15 [App. 118-119]. Sgt. Macias also believed the duration of the bite, lasting less than minute, during the time officers were able to get the Plaintiff to comply was reasonable for officer safety. *See* Ex. J at ¶ 13 [App. 127].

Moreover, if no constitutional violation is found by the officer using force then there can be no bystander liability because "as bystanders as there was no reason for them to intervene in a situation where the force being used was reasonable." *Woodard v. Carol*, No. 2:21-CV-0059, 2022 WL 4479123, at *9 (W.D. La. Sept. 26, 2022). "Mere presence at the scene of alleged use of excessive force, however, does not give rise to bystander liability." *Brooks v. Taylor Cty*., No. 1:20-CV-049-H, 2021 WL 4458380, at *30 (N.D. Tex. Sept. 29, 2021). This is because "[a] bystander-liability claim stemming from the use of excessive force turns on whether the bystander has 'a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it.'" *Id.* (citing *Hale v. Towley,* 45 F.3d 914, 919 (5th Cir. 1995)). All of the very experienced deputies that were in the garage and observed the deployment of K-9 Arlo and the duration of Arlo's bite have opined the force they observed being used was reasonable given the circumstances. Because the force used was reasonable the bystander liability claims against Deputies Cisneros, Lidiak, Siegfried, Treharne, and Macias should be dismissed.

**C.  The Brevity of An Incident Weighs Against The Imposition of Bystander Liability**

Additionally, because of the brief interaction of the alleged use of force against the Plaintiff, with a bite that lasted in total approximately one minute and twenty seconds, and the speed with which it happened, should the Court find the use of force unreasonable it should still find the other deputies in the garage entitled to qualified immunity. *See* FCR (Doc. 96) at 6, Ex. A-7 (Hastings BWC) at 1:02:02-10:03:16 [App. 080] (showing the bite in total was approximately one minute and twenty seconds in duration). Based on the brevity of the situation and the rapidly

changing circumstances the other deputies in the garage could not have acted quickly enough to intervene during those eighty seconds.   As the FCR noted only approximately  "fourteen seconds elapsed between Salazar rolling onto his stomach and Arlo releasing the bite." *See* FCR (Doc. 96) at 9, Ex. A-6 at 18:05-48 [App. 079], Ex. A-7 at 1:02:44-1:03:25 [App. 080], Ex. A-8 at 33:26-34:14 [App. 081]. *Id.*  The FCR also reflects from the time the Plaintiff emerged from the car and landed on the ground approximately forty-three seconds passed until the Plaintiff was handcuffed. *See* FCR (Doc. 96) at 6, Ex. A-7 at 1:02:02-1:03:26 [App. 080], Ex. A-8 at 32:45-34:15 [App. 081].  Whether it be eighty seconds, forty-three seconds, or fourteen seconds those are incredibly short amounts of time for deputies to intervene in a rapidly changing situation.

In *Stevenson v. City of Albuquerque*, two officers, Chafin and Molina, arrived on scene and engaged in a struggle to handcuff and arrest a suspect while a third officer, Daffon, struck the suspect.  *Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 873 (D.N.M. 2020).  The district court granted summary judgment on the failure to intervene claim against Chafin and Molina noting that ten seconds elapsed from when the two officers arrived to when the officers secured the suspect and because the third officer, Daffon, struck the suspect while they were trying to secure the suspect's right hand to effect the arrest and ensure that he was not hiding a weapon.  *Id.* The district court concluded that based on the timeline of the events, the brevity of the incident, and the actions of Chafin and Molina in trying to effectuate the arrest when the use of force occurred they had no "realistic opportunity to intervene." *Id.*  The court went on to hold that the plaintiffs "have not clearly established a Fourth Amendment right for nearby officers to anticipate and prevent sudden use of force while struggling against an apparently resisting felony suspect." In *Rawlings v. Se. Pennsylvania Transportation Authority*, two officers tackled a suspect who fled on foot to the ground. *Rawlings v. Se. Pennsylvania Transp. Auth.*, No. 2:19-CV-04698, 2022 WL

15525755, at *7 (E.D. Pa. Oct. 27, 2022). Because of the speed of the entire interaction, the court held that because the use of force was tackling the suspect to the ground, which the officers did at almost the exact same time, the "[o]fficers would have had a few split seconds, if that, to intervene in the other's use of force. That is not a realistic amount of time such that they should have been expected to intervene." *Id.*

In *El v. City of Pittsburg*, the Third Circuit Court of Appeals upheld a district court's granting of summary judgment to an officer as to one claim of bystander liability and reversed the denial of another bystander claim against same officer holding that as to both bystander liability claims "whether an incident is momentary, its 'brevity' may 'defeat[][a] … failure-to-intervene claim.'" *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020). There, the Third Circuit Court of Appeals determined that "[g]iven the speed with which the incident ended, no reasonable jury could conclude that [the officer] had a realistic and reasonable opportunity to intervene." *Id.*

Because the deputies did not observe any unreasonable uses of force and were all watching for weapons during a rapidly evolving situation they did not have a realistic opportunity to intervene in any other officer's use of force. Consequently, summary judgment should be granted on the bystander liability claim brought against them.

## IX.
### The Bystander Liability Claim Against Deputies Uptain, Jaramillo, And Delarosa Should Be Dismissed Because They Were Not In the Garage

Officers who do not see excessive force being used cannot be held liable under the theory of bystander liability because they must have an opportunity to take steps to prevent the use of force or stop it in order to be held liable. *Joseph ex rel. Estate of Joseph,* 981 F.3d at 343. As explained herein these deputies were not in the garage and therefore did not have the opportunity to observe the use of force much less have a reasonable opportunity to prevent the use of force.

*See* Ex. D at ¶¶ 4-6 [App. 104-105], Ex. E at ¶¶ 7-9 [App. 107-108], Ex. G at ¶¶ 6-8 [App. 114].

In *Nowell v. Acadian Ambulance Service*, two officers sued on bystander liability claims submitted affidavits that they did not strike the plaintiff and did not observe anyone else strike the plaintiff.    *Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 506–07 (W.D. La. 2001). The district court granted summary judgment on the bystander claim against them because there was no evidence that either officer "used excessive force on plaintiff, observed the complained use of excessive force or allowed plaintiff to be subjected to the use of excessive force, nor is there any evidence that [either officer]  had any opportunity to take steps to prevent the alleged use of force, or to intervene to stop it." *Id.* at 507.  Similarly, in *Paternostro v. Crescent City Connection Police Department,* summary judgment was granted to an officer that did not strike the suspect because although he was on scene there was no evidence that he could have prevented the force that was used by another officer against the suspect.    *Paternostro v. Crescent City Connection Police Dep't*, No. CIV.A. 00-2740, 2002 WL 34476319, at *11 (E.D. La. Apr. 2, 2002).  Because Deputies Uptain, Jaramillo, and Delarosa did not see the alleged use of excessive force and were not even in the same room when it occurred they cannot be held liable for failing to prevent it.

## X.
### CONCLUSION

Based on the summary judgment evidence presented the Plaintiff's claims against Defendants Hastings, Treharne, Siegfried, Likiak, Macias, Uptain, Cisneros, Delarosa, and Jarmillo should be dismissed for the following reasons:

1.  The deployment of K-9 Arlo by Corporal Hastings to apprehend the Plaintiff was objectively reasonable and does not violate clearly established law;

2.  The duration of K-9 Arlo's bite to subdue the Plaintiff up until the moment before he was fully handcuffed was objectively reasonable and does not violate clearly established law;

3. Deputies Uptain, Jaramillo, and Delarosa were not in the garage when the use of force happened; and

4. Deputies Cisneros, Lidiak, Siegfried, Treharne and Macias cannot be subject to bystander liability when there was no use of force by Corporal Hastings that violated the Plaintiff's constitutional rights.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request the Court grant this motion for summary judgment.

Respectfully submitted,

*/s/ Matt D. Matzner*
MATT D. MATZNER
Texas Bar No. 00797022
MORGAN DAY VAUGHAN
Texas Bar No. 24060769
Crenshaw, Dupree & Milam, L.L.P.
P.O. Box 64479,
Lubbock, Texas 79464-4479
Telephone: (806) 762-5281;
Fax: (806) 762-3510
mmatzner@cdmlaw.com
mvaughan@cdmlaw.com
***Counsel for Defendants Hastings, Treharne, Siegfried, Likiak, Macias, Uptain, Cisneros, DeLaRosa, and Jarmillo***

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the above and foregoing was on this 12th day of October, 2024, served as follows:

**<u>VIA CERTIFIED MAIL</u>**
**<u>NO. 9589 0710 5270 2064 2828 56</u>**
Ryan C. Salazar
TDCJ Middleton Unit
13055 FM 3522
Abilene, Texas 79601
***Pro se Plaintiff***

*/s/ Matt D. Matzner*
MATT D. MATZNER