UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

RYAN C. SALAZAR,
Institutional ID No. 02476330

                         Plaintiff,

v.                                                      No.  5:23-CV-00054-H

STEPHEN HASTINGS, *et al.*,

                         Defendants.

## OPINION AND ORDER

In this civil-rights action under 42 U.S.C. § 1983, Plaintiff Ryan Salazar, a state

prisoner, complains that Corporal Stephen Hastings, a K9 handler with the Lubbock

County Sheriff's Office (LCSO) used excessive force when he deployed his K9 during

Plaintiff's arrest and allowed the dog to continue to bite Plaintiff after he was restrained and

no longer resisting.  Plaintiff also raises bystander-liability claims against eight other LCSO

officers who participated in the arrest.  The defendants now jointly move for summary

judgment on the defense of qualified immunity, Dkt. No. 99, and support their motion with

a brief and appendix in support, Dkt. Nos. 100–103.

As explained below, after considering the briefing of the parties, the competent

summary judgment evidence, and the applicable law, the Court finds that the plaintiff has

failed to overcome the defendants' assertion of qualified immunity and grants the

defendants' motion for summary judgment.  In reaching that conclusion, the Court also

resolves several other pending motions, including the plaintiff's pro se motions for leave to

file responses to the motion for summary judgment, Dkt. Nos. 104, 106, the plaintiff's newly

retained counsel's motion for leave to file an untimely, fourth summary judgment response,

Dkt. No. 111, and the defendants' motions to strike the extraneous summary judgment responses, Dkt. Nos. 109, 118.

## 1.     Background and Plaintiff's claims

Plaintiff contends that on February 15, 2023, he was at his grandmother's house.  *See* Dkt. No. 22.  He was unaware that he had any outstanding warrants.  *Id.*  He drank two pints of liquor and went outside to speak with someone in a vehicle stopped in front of his home.  *See* Dkt. No. 96 at 3–4.  After he went inside, he passed out drunk in the "back seat-ish" of a car in his grandmother's garage.  *Id.* at 4 and n.5.  He alleges that he awoke to officers standing over him yelling at him to show his hands.  *Id.* at 5.  He states that he immediately complied.  He claims that Defendant Hastings deployed a K9 into the car without any warning, despite the fact that Plaintiff was showing his hands, laying down and not moving, was not resisting, had no weapons, and posed no threat.  *Id.*; Dkt. No. 22 at 4–5.  He asserts that the dog bit him and continued biting him for long enough to leave his left arm deformed and cause permanent nerve damage.  Dkt. No. 22 at 5.  He asserts that he was hospitalized and underwent surgery, received 20-30 sutures, and required wound care for about two months.  *Id.*  He seeks $5 million in monetary relief.  *Id.* at 4.

## 2.     Defendants' motion

Defendants argue that they are each entitled to qualified immunity.  Specifically, they argue that Defendant Hastings's decision to deploy Arlo was reasonable under the circumstances, and Arlo's bite was not excessive in fact or in duration.  They assert that, consistent with Fifth Circuit precedent, neither the use of the K9 nor the duration of the bite violated Plaintiff's clearly established constitutional rights.  Then, they argue that Plaintiff's bystander-liability claims against Defendants Cisneros, Lidiak, Siegfried, Treharne, and

Macias should be dismissed because the force used was not excessive, and the incident was very brief, so they had no duty to intervene. Finally, Defendants assert that Plaintiff's claims against Defendants Uptain, Jaramillo, and Delarosa should be dismissed because they were not in the garage, did not observe the incident, and had no opportunity to intervene.

### A.    Summary Judgment Evidence

In support of their motion for summary judgment, the defendants submitted an appendix containing about 200 pages of summary-judgment evidence, including the self-sworn declaration of LCSO SWAT Commander Chris Daniels, LCSO reports from Plaintiff's arrest, photos of Plaintiff after his arrest, Plaintiff's Lubbock County Detention Center (LCDC) Booking Sheet, Plaintiff's LCDC working inmate records and medical records, Plaintiff's relevant state-court criminal records, and the self-sworn declarations of Defendants Cisneros, Delarosa, Jaramillo, Lidiak, Uptain, Siegfried, Treharne, Macias, and Hastings. The defendants also submitted video recordings of the arrest from the body-worn cameras (BWC) of Defendants Uptain, Williams, Daniel, Treharne, Hastings, Macias, and Cisneros.

The summary judgment evidence shows that officers[1] went to the home of Plaintiff's grandmother to arrest him on outstanding felony warrants for evading arrest with a vehicle and unauthorized use of a motor vehicle, as well as misdemeanor warrants for theft and criminal mischief. Dkt. No. 101 at 115–153. The officers were aware that Plaintiff was a

---

[1] The records show that some of the defendants were in the initial group of officers who went to the home to assist in apprehending Salazar on the outstanding felony warrants. *See* Dkt. No. 101 at 119–138. Other defendants were called to the scene after Salazar barricaded himself inside. *See id.* at 115–116; 140–153. Not all of the officers who were present or participated in the arrest are named as defendants in this action.

confirmed gang member with the West Texas Tangos, which they knew to be associated with criminal activities, including weapons violations, narcotics trafficking, aggravated assaults, robberies, and homicides. *Id.* They also reviewed Plaintiff's criminal history before arriving at the scene, so they were aware that it was "extensive and violent," including arrests for aggravated assault and convictions for aggravated robbery. *See*, *e.g.*, *id.* at 127.

Officers established covert surveillance on the residence and observed him outside of the home. *Id.* at 123. Upon receiving the "takedown signal," officers converged and surrounded the home, but as they approached, Plaintiff ran back inside. *Id.* The officers activated their emergency lights and sirens and used an intercom system to make loud announcements for Plaintiff to exit the home. Officers continued to surround the home and broadcast loud orders for Plaintiff to surrender on and off for about one hour as other investigators worked to obtain a search warrant for the home. *Id.* at 36. During the hour-long standoff, Plaintiff's girlfriend exited the home and officers observed Plaintiff shut and secure the door behind her. *Id.* at 36, 107. Despite this, she tried to convince the officers that Plaintiff had fled the residence out of the back door and jumped a fence. Because officers had maintained surveillance of the entire perimeter and saw Plaintiff in the house closing the door behind his girlfriend, they did not believe her. *Id.* Officers continued to broadcast directives for Plaintiff to come out of the house. *Id.*; *see also* Williams BWC. Officers near the door also shouted warnings that if Plaintiff did not come out, officers would send in K9 units after him. *See* Uptain BWC 05:49–53.

After obtaining a search warrant, officers breached the front door of the residence using a battering ram attached to an armored vehicle. *See* Dkt. No. 101 at 60. They entered

and searched the home, but they did not find Plaintiff inside. A team of officers, including Defendants Cisneros, Lidiak, Siegfried, Macias, Treharne, and Hastings (with K9 Arlo), went to search a garage in the backyard. *See id*. at 116, 127, 136, 141, 146–47, 151.

Officers determined that it was safer to send K9 Arlo to conduct the initial search of the garage because there were many places that Plaintiff could potentially be hiding with weapons. Dkt. No. 101 at 151. Defendant Hastings released Arlo to search the garage, but Arlo did not locate the plaintiff. Hastings BWC 56:18–57:08. Defendant Hastings observed Arlo alert to a human odor near a barber chair under an access point to the attic and officers believed Salazar may have crawled into the attic to hide. *Id.* at 147, 151. Defendant Hastings removed Arlo from the garage so that the other officers could search. *Id.* at 151. Officers continued to loudly announce that if Plaintiff did not come out and surrender, they would use force, including gas and a dog. *See id.* at 146; *See* Cisneros BWC 03:15–4:38; Macias BWC 29:39–30:34. Meanwhile, Arlo barked consistently outside the garage. *Id.*

Defendant Treharne entered and observed a four-door car inside the garage. Dkt. No. 101 at 142. He attempted to open the trunk of the vehicle but could not because the vehicle was disabled and there was no electrical power. *Id.*; Macias BWC 0:30:42–45. Defendant Macias opened the back door of the vehicle and did not see anyone in the passenger compartment. Dkt. No. 101 at 147. He tried to fold down the back seats to access the trunk but felt resistance "like someone was holding it up." *Id.*; Macias BWC 30:50–31:10. Macias called out to the other officers for backup and walked around to attempt to access the trunk from the other side of the vehicle. *Id.* When Macias released the latch and laid the seat down, Defendant Treharne saw Plaintiff laying in the trunk and immediately started to command him to show his hands. Dkt. No. 101 at 142, 147.

5

Defendant Treharne saw Plaintiff lift his left hand, but Plaintiff's right hand remained concealed. *Id.* at 142. Defendant Treharne and other officers repeatedly shouted at Plaintiff to show his hands and get out of the trunk, warning him that if he refused, a K9 would be sent in to retrieve him, and it would bite. *See id.* at 137.

Plaintiff did not emerge, so the officers called for Defendant Hastings to bring in Arlo. Hastings observed Plaintiff's left hand raised but could not see Plaintiff's right hand. *Id.* at 151. Hastings agreed that it was safest to send Arlo into the vehicle because the officers did not know whether Plaintiff had weapons hidden with him in the trunk, they could not see one of his hands, and Arlo could more easily and safely fit into the space behind the back seat to retrieve Plaintiff. *Id.* The first time Hastings deployed Arlo into the vehicle, Arlo returned without engaging. Officers called out to Plaintiff again, repeatedly instructing him to show both hands and come out of the vehicle and warning him that if he did not, they would send in the dog to bite him. *See id.* at 142. Plaintiff did not comply, so Hastings sent Arlo into the vehicle again, redirecting the dog once more before Arlo engaged and bit Plaintiff on his left forearm. *Id.* at 152.

Hastings immediately began shouting at Plaintiff to bring the dog out of the car. Hastings explains that he learned this tactic in K9 training for officer safety. *Id.* at 152. Plaintiff said "okay, okay" but did not immediately move. After about 30 seconds, Plaintiff began to slowly emerge. Defendant Hastings grabbed Plaintiff's shirt and pulled him out of the vehicle onto his back on the ground with Arlo still attached. Officers shouted at Plaintiff to roll over onto his stomach, but he did not comply. So, officers rolled him over onto his stomach as Arlo continued to bite his forearm. Plaintiff was kicking his legs, so Defendant Treharne contained his legs while Defendants Macias and Hastings applied handcuffs.

Once Defendant Macias placed a handcuff on Plaintiff's right wrist, Defendant Hastings released Arlo so that Defendant Macias could apply the cuff to his left wrist. Arlo released his bite just before Macias completed applying the handcuffs, and Arlo did not bite Plaintiff at any point after the handcuffs were applied.

Hastings explains that it was important for Arlo to remain engaged for the short time that it took officers to roll Plaintiff over, contain his legs, and secure his arms for handcuffing, which all together took less than one minute. Dkt. No. 101 at 153. At that point, Plaintiff had evaded and resisted arrest, refused to comply with repeated orders, and officers did not know whether Plaintiff had any weapons, so they needed to maintain control until he was restrained. *Id.*

The records reflect that Plaintiff was taken to University Medical Center for evaluation and treatment. Dkt. No. 103 (sealed). He was examined by an orthopedic resident, a CT scan of his left elbow was normal, and x-rays showed no fracture or foreign body. Dkt. No. 103-1 at 30–31. A three-hour compartment check was normal, so medical providers closed the wounds with sutures and prescribed a 10-day course of antibiotics. *Id.* at 31. Plaintiff was discharged from the emergency department with instructions for wound care and suture removal, which were given to the LCSO. *Id.* The LCDC records show that Plaintiff did not fully comply with the treatment instructions, his arm became infected, and he was evaluated and prescribed additional antibiotics and ibuprofen. Dkt. No. 103-1 at 36–50. After Plaintiff's sutures were removed, he applied to be a working inmate at LCDC and twice denied having any medical condition that would prevent him from working or limit job performance. Dkt. No. 101 at 100–110.

**B.      Defendant Hastings's assertion of qualified immunity**

Defendant Hastings argues that he is entitled to qualified immunity on both his decision to deploy Arlo and the duration of Arlo's bite.  He contends that both the deployment and the bite were reasonable under the circumstances and consistent with Fifth Circuit precedent.  He emphasizes the dangerous situation created by Plaintiff's barricading himself and hiding inside the trunk of a vehicle in a garage, and his refusal to comply with loud, repeated directions to show his hands and surrender.  And he underscores that the officers were there to arrest Plaintiff for multiple outstanding warrants, including two felonies, and that they were familiar with Plaintiff's violent criminal history and his known affiliation with a violent, criminal gang.  He also focuses on his perception of danger in the garage and the need to address the situation quickly, because he did not know if Plaintiff had a weapon, he could not see one of Plaintiff's hands or the area around him in the trunk, and he did not know if others were hiding in the garage.

**C.      Defendants Cisneros, Lidiak, Siegfried, Treharne, and Macias's assertion of qualified immunity**

Defendants Cisneros, Lidiak, Siegried, Treharne, and Macias were in the garage when Defendant Hastings deployed Arlo.  They assert that they cannot be held liable as bystanders because the force used was reasonable under the circumstances.  As a result, they argue that their conduct did not violate any of Plaintiff's clearly established rights, and they are entitled to qualified immunity.

**D.      Defendants Uptain, Jaramillo, and Delarosa's arguments**

Defendants Uptain, Jaramillo, and Delarosa were not in the garage when Arlo was deployed or while Arlo was biting Plaintiff.  They argue that they cannot be held liable as bystanders because they had no opportunity to observe the use of force, much less prevent

it. Thus, they assert that their acts or omissions did not violate any of Plaintiff's clearly established constitutional rights.

### 3.    Plaintiff's responsive pleadings and Defendants' motions to strike

Plaintiff moved for leave to file two pro se responses to the defendants' motion for summary judgment. Dkt. Nos. 104, 106. Then he submitted a brief in support of his responses "to point out a couple more key points." Dkt. No. 108. The defendants replied, Dkt. No. 107, and moved to strike the additional responses, Dkt. No. 109, urging the Court to limit Plaintiff to one responsive pleading in accordance with the procedural and local rules.

Then, nearly three weeks after briefing was otherwise complete, an attorney appeared on behalf of the plaintiff and sought leave to file an untimely fourth response. Dkt. No. 111. He did not attach a proposed response to the motion. *Id.* The defendants opposed counsel's motion, arguing that permitting counsel a fourth bite at the apple would be improper because no exceptional circumstances exist, and counsel's untimely entry into the case evinces a lack of diligence. Dkt. No. 112. Defendants also submitted an appendix to support their opposition. Dkt. No. 113. The plaintiff replied and attached a proposed, counseled response to the defendants' motion for summary judgment. Dkt. Nos. 117, 117-1. Defendants moved to strike the reply and the attached proposed summary judgment response. Dkt. No. 118. The plaintiff responded, Dkt. No. 119, and the defendants replied, Dkt. No. 120.

As a result, the Court finds that this matter has been fully briefed. Before turning to the defendants' motion for summary judgment, the Court will resolve the other pending motions and determine which pleadings may be properly considered.

9

The Court grants Plaintiff's pro se motions for leave to file his first two responses. Dkt. Nos. 104, 106. Plaintiff's third response, Dkt. No. 108, was also timely, and the Court accepts it. The Court warns plaintiff, however, that pro se status does not exempt a plaintiff from compliance with relevant rules of procedural and substantive law. *See Partain v. City of South Padre Island, Tex.*, 793 F. App'x 288, 292 (5th Cir. 2019) ("Although arguments by pro se litigants are liberally construed, pro se litigants must comply with the relevant rules of procedure.") (citing *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law.")). Piecemeal pleadings are disfavored, and the Court ordinarily prohibits pro se litigants from supplementing their claims on a rolling basis. But because Plaintiff's three pro se responses were all filed within his original response deadline, were all relatively short, and it is clear that he did not intend any of the responses to supersede or replace his other responses, the Court will consider them collectively as his response to the defendants' motion for summary judgment. Thus, Defendants' first motion to strike, Dkt. No. 109, is denied.

But the Court denies counsel's motion for leave to file an untimely fourth response. Dkt. No. 111. Defendants show that Plaintiff's now-retained counsel knew of and began investigating the case before the defendants filed their motion for summary judgment. Dkt. No. 113 at 5. Moreover, he knew at that time that the defendants' summary judgment motion was imminent. *See* Dkt. No. 112 at 2. On October 31, 2024, Defendants' counsel sent Plaintiff's counsel a link to view the summary judgment videos and informed him that Plaintiff had already filed two pro se responses to the defendants' motion for summary

judgment and that the defendants would oppose any additional responses. Dkt. No. 113 at 10.

Still, Plaintiff's counsel waited 24 additional days before entering an appearance in this case. Dkt. No. 112. Even though counsel was aware that the deadline for responding had passed and that Plaintiff had already filed more than one response, he did not submit a proposed response with his motion for leave. Dkt. No. 111. Instead, although he had known about the case for nearly two months and had access to the summary judgment evidence for more than three weeks, Plaintiff's counsel sought an additional two months to submit his response. *See* Dkt. Nos. 111, 114. Counsel finally filed his proposed response to the defendants' motion for summary judgment on January 3, 2025—as an attachment to his reply to the Defendants' opposition to his motion. Dkt. No. 117-1. Then, when Defendants objected and moved to strike, he retracted the proposed response. Dkt. No. 119 at 2–3 (explaining that, "[t]o be clear, Plaintiff has not filed his proposed response nor its exhibits," and implying that the attachment was merely a placeholder to show his diligence).

Briefing in this case was complete weeks before Plaintiff's counsel appeared and months before he filed an apparently not finalized version of his proposed response. As argued by Defendants, counsel could have appeared in this case before the summary judgment motion was filed or at any time before Plaintiff's response deadline lapsed. Instead, he chose to wait until after briefing was complete. Plaintiff's counsel has not shown exceptional circumstances warranting a fourth—or maybe even fifth—bite at the apple at this late juncture. Moreover, the defendants have dutifully replied to each of the plaintiff's pro se responses as well as counsel's filings, and the Court finds that they would be prejudiced by any further delay caused by reopening the briefing period. For these

reasons and as argued by Defendants, the Court denies counsel's motion for leave to file another summary judgment response, Dkt. No. 111, and grants Defendants' second motion to strike, Dkt. No. 118.

In any event, as explained below, the Court also finds that permitting counsel to try again would be futile.

4.    **Legal standards**

A.    **Summary Judgment**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, courts must not make credibility determinations or weigh evidence but must instead draw all reasonable inferences for the non-moving party. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002). A plaintiff "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

That said, summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). And the Court need not accept the plaintiff's version of the facts where the record evidence clearly contradicts those allegations. *Waddleton v. Rodriguez*, 750 F. App'x 248, 253–54 (5th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)).

B.    Section 1983 and qualified immunity

Section 1983 "provides a claim against anyone who 'under color of any ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). "A plaintiff makes out a [Section] 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 23, 236 (5th Cir. 2008)). But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983. Defendants who perform discretionary duties—such as police officers and jailers—may invoke the affirmative defense of qualified immunity in response to a plaintiff's Section 1983 suit. Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

In analyzing whether an individual defendant is entitled to qualified immunity, the court considers whether the plaintiff has alleged any violation of a clearly established right, and, if so, whether the individual defendant's conduct was objectively reasonable. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Duckett v. City of Cedar Park*, 950 F.2d 272, 276–80 (5th Cir. 1992). In so doing, the court should not assume that plaintiff has stated a claim, i.e., asserted a violation of a constitutional right. *Siegert*, 500 U.S. at 232. Rather, the court must be sure that, if the facts alleged by plaintiff are true, a violation has clearly occurred. *Connelly v. Comptroller*, 876 F.2d 1209, 1212 (5th Cir. 1989). Even if defendants are alleged to have acted in unison, the court must address the actions of each individually to determine

13

whether qualified immunity applies. *Cass v. City of Abilene*, 814 F.3 721, 730–31 (5th Cir. 2016); *Meadours v. Ermel*, 483 F.3 417, 421–22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

A mistake in judgment does not cause an officer to lose his qualified immunity defense. The Supreme Court explained long ago that "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341–43 (1986)). And "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley*, 475 U.S. at 341. Further, that the officer himself may have created the situation does not change the analysis. That he could have handled the situation better does not affect his entitlement to qualified immunity. *Young v. City of Killeen*, 775 F.2d 1349, 1352–53 (5th Cir. 1985).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted). This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S.731, 741 (2011). In rare cases, however, "the unlawfulness of the officer's conduct is sufficiently clear even though

14

existing precedent does not address similar circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64; *cf. Taylor v. Riojas*, 592 U.S. 7, 9 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks and citation omitted). Likewise, the Supreme Court has stated that the purpose of the doctrine is to "give[ ] government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). When a defendant invokes qualified immunity in his answer, the burden shifts to the plaintiff to show that the defense is unavailable. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).

Defeating an invocation of qualified immunity requires that the plaintiff "point to summary judgment evidence (1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was clearly established at the time." *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (internal quotation marks omitted). So, while the "plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment," *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020), the plaintiff bears a heavy burden in overcoming a defendant's good-faith invocation of qualified immunity. *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

Although Supreme Court precedent does not require a case directly on point, existing precedent must place the statutory or constitutional question beyond debate. *Pauly*, 580 U.S. at 79. That is, the clearly established law on which a plaintiff relies should not be defined at a high level of generality but must be particularized to the facts of the case. *Id.* Thus, failure to identify a case in which an officer acting under similar circumstances was held to have violated a plaintiff's rights will most likely defeat the plaintiff's ability to overcome a qualified immunity defense. *Id.*; *Surratt v. McClarin*, 851 F.3d 389, 392 (5th Cir. 2017).

### C.    Excessive Use of Force

Claims of excessive use of force during an arrest are governed by the Fourth Amendment's reasonableness standard. *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019), *no cert.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). Under this standard, the "plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

Courts must consider the totality of the circumstances when evaluating the reasonableness of a use of force. *Garza*, 943 F.3d at 745; *see also Martin v. Seal*, 510 F. App'x 309, 313 (5th Cir. 2013) (holding that the question of whether force used by an officer was reasonable must be evaluated in the context in which the force was deployed); *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996); *Williams v. Bramer*, 180 F.3d 703, 704 (5th Cir. 1999). Courts should not Monday-morning-quarterback an officer's split-second decision. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see also Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009). Instead, courts should view excessive-force claims "from the perspective of

a reasonable officer on the scene" considering only those facts the officers knew at the time. *Garza*, 943 F.3d at 745 (quoting first *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018), then citing *Pauly*, 580 U.S. at 77–78). "Further, only the objective reasonableness of force matters for Fourth Amendment purposes—an officer's subjective motivation and intent are irrelevant." *Hill*, 587 F.3d at 234.

The injury must "overcome the *de minimis* requirement" to be cognizable. *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017). The courts must consider the relationship between the amount of force allowed by the constitution as compared to the extent of the injury itself. *Id.* (citing *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996)).

When evaluating the second element of the claim, a plaintiff does not have to prove that the "excessive force was the sole cause" of the injury or death, nor that such injury or death was foreseeable. *Goode v. Baggett*, 811 F. App'x 227, 231 (5th Cir. Apr. 24, 2020) (citing first *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996), and then *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018)). As a result, pre-existing conditions do not factor into the analysis. *Baggett*, 811 F. App'x at 231. Essentially, the excessive force alleged need only be a "contributory cause" of the injury. *Id.* (quoting *Darden*, 880 F.3d at 728).

Finally, the third element is evaluated by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Baggett*, 811 F. App'x at 231–32 (quoting *Goodman v. Harris Cty.*, 571 F.3d 388, 397 (5th Cir. 2009)). Rather than a mechanical application, courts should balance the following factors: "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These considerations are broadly known as the *Graham* factors.

5.    **Analysis**

After reviewing the competent summary judgment evidence and the parties' briefing, the Court finds that no genuine issues of material fact remain to necessitate trial. Plaintiff has not pointed to any evidence in the record to raise a genuine fact issue to negate the defendants' well-pleaded qualified-immunity defense. In short, he has not carried the burden of proving that the defendants' actions were objectively unreasonable in light of clearly established law at the time of the encounter.

A.    **Video Evidence**

The first problem for Plaintiff is that the defendants produced several authenticated video recordings of the encounter from different angles. *See* Dkt. Nos. 101 at 83–89; 102. And, as noted by the United States Magistrate Judge, the video footage directly contradicts many of Plaintiff's assertions. *See* Dkt. No. 96. For example, the video footage contradicts Plaintiff's contention that the Defendant Hastings deployed the K9 "without warning." *See id.*; Hastings BWC. Instead, the videos show that officers loudly broadcast dozens—if not hundreds—of warnings to Plaintiff over the course of their hour-long standoff and search. Moreover, several of the defendants shouted loud warnings in the moments immediately before deploying Arlo, and, when Arlo did not engage with Plaintiff the first time he was deployed into the vehicle, the defendants warned him again and gave him another chance to come out on his own before sending Arlo back into the vehicle. *See, e.g.*, Hastings BWC at 1:01:25–32. So, the Court does not accept Plaintiff's version of the facts where the record

evidence clearly contradicts those allegations. *Waddleton v. Rodriguez*, 750 F. App'x 248, 253–54 (5th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)).

### B.    Injury

It is undisputed that Plaintiff suffered some injury as a result of Arlo's bite. The parties agree that Plaintiff suffered deep lacerations and received sutures and antibiotics. Otherwise, Defendants contend that Plaintiff's injuries were far more minor than he alleges, although they do not contend that the injuries were de minimis. And Defendants point to Plaintiff's LCDC medical records showing that he was "33% non-compliant with his antibiotic and 50% non-compliant with his wound care." Dkt. No. 101 at 93. Even so, Defendants note, and the summary judgment evidence shows, that when Plaintiff's sutures were removed less than two weeks after the dog bite, Plaintiff twice denied any medical condition that would prevent him from working or limit his job performance. *Id.* at 100–01. And a couple months later, he answered the same questions again in the same way— denying any medical condition that would affect his ability to work as a barber, janitor, outside, or in the commissary. *Id.* at 106–07.

Plaintiff asserts, without any supporting facts or evidence, that in addition to receiving sutures for deep lacerations, he suffered a ripped tendon, underwent surgery, and sustained permanent nerve damage. *See* Dkt. No. 22 at 6; Dkt. No. 96 at 6–7. But despite submitting multiple responses, including one with the assistance of counsel, Plaintiff still has offered no evidence to support these allegations. The Court does not have to accept Plaintiff's conclusory allegations, offered without any specific factual or evidentiary support. *See Schultea v. Wood,* 47 F.3d 1427, 1433 (5th Cir. 1995); s*ee also Hemphill*, 805 F.3d at 538 (explaining that summary judgment "may not be thwarted by conclusional allegations,

unsupported assertions, or presentation of only a scintilla of evidence"). Even so, for the purpose of their motion, Defendants do not dispute that Plaintiff's injury is more than de minimis. *See* Dkt. No. 100. Instead, Defendants focus their arguments on the reasonableness of the force used.

The Court finds that deep lacerations, requiring sutures, antibiotics, and wound care, are sufficient to overcome the de minimis requirement. In any event, even if the Court accepts Plaintiff's unsupported conclusions about the extent of his injuries as true, it does not alter the outcome of this case. The degree of injury is relevant to but not dispositive of the excessive-force claim. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (explaining that "[i]njury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts"). Thus, any remaining dispute over the extent of Plaintiff's injuries would not necessitate trial because the deployment of the K9 and brief duration of the bite were reasonable in the dangerous context of Plaintiff's (1) barricading himself in a small, dark enclosure; (2) refusal to comply with repeated, loud directives; and (3) at least some active resistance.

C.    **The reasonableness of the force**

Considering the totality of the circumstances, Defendant Hastings reasonably deployed Arlo. The unrefuted summary judgment evidence shows that Defendants sought to arrest Plaintiff on outstanding warrants for two felonies and two misdemeanors. These crimes alone were not necessarily violent or dangerous. But Defendants also knew that Defendant had an "extensive and violent" criminal history and that he was a confirmed member of a violent, criminal gang. Thus, the first *Graham* factor—the severity of the crime at issue—supports Defendants' position.

Next, the summary judgment evidence demonstrates that Plaintiff hid from officers for an hour and refused to comply with multiple, loud orders to come out and show both of his hands. Plaintiff claims that he was unaware of his outstanding arrest warrants or the officers' presence and that he simply went inside and fell asleep in the "backseat-ish" of a broken-down car in his grandmother's garage. The Court finds that assertion dubious, at best. But even if it were true, no reasonable officer would have perceived that Plaintiff was merely taking an innocent nap. The summary judgment evidence conclusively establishes that officers broadcast dozens—if not hundreds—of loud announcements imploring Plaintiff to come out and surrender. Defendant Hastings notes that the announcements were so loud that while he was positioned in the alley at the rear of the residence, he could clearly hear and understand the announcements being made from the armored car in the front of the residence. Dkt. No. 151. Similarly, Defendant Jaramillo was in the kitchen of the residence when Plaintiff was found, but he attests that he could hear the deputies' commands for Plaintiff to surrender and get out of the car. *Id.* at 124. Moreover, the officers' encounter with Plaintiff's girlfriend, and their observation of Plaintiff shutting and securing the front door, contributed to a reasonable perception that Plaintiff was attempting to evade arrest.

Defendants also emphasize that they knew about Plaintiff's extensive and violent criminal history and his known affiliation with the West Texas Tangos—a violent criminal gang organization. Plaintiff refutes that he has any gang affiliation and asserts that the officers may have mistakenly attributed his brother Ray's gang membership to him. *See* Dkt. No. 108. But even if Plaintiff's assertion is true, it does not alter the analysis. It is undisputed that each of the defendants was informed prior to his arrival on the scene that Plaintiff was a confirmed member of the West Texas Tangos. Even if that information later

turned out to be unreliable, it does not change what the officers perceived at the time. Any reasonable officer would have perceived an increased danger in trying to apprehend a fugitive gang member with multiple felony warrants and a violent criminal history.

The parties also dispute whether Plaintiff at least partially complied with the officers' orders. Plaintiff avers that he immediately showed both of his hands. Only Plaintiff's left hand can be seen on any of the videos. *See* Treharne BWC at 0:16:17–27; Hastings BWC 1:01:07; Cisneros BWC 0:05:57–58. Defendant Treharne contends that Plaintiff "lifted his left hand" but "kept his right hand concealed." Dkt. No. 101 at 142. Defendant Hastings confirms that he could see Plaintiff's left hand to the wrist, but he could not see Plaintiff's right hand. Dkt. No. 101 at 152. None of the defendants who were in the garage say that they saw Plaintiff's right hand. Thus, the defendants in the garage feared that Plaintiff "was concealing a weapon in his right arm/hand or in the area around him." *Id.* at 142; *see also id.* at 152.

It is undisputed that Plaintiff was laying in the trunk area of a small car, accessible only through the opening of the back door by folding down the back seat. Regardless of whether Plaintiff attempted to show his right hand,[2] the video definitively shows that he did not emerge from the vehicle as ordered. And Plaintiff does not dispute that the defendants were unable to see the area around him in the small, dark trunk area.

As long as Plaintiff was refusing to come out of hiding and the officers were unable to determine whether he had weapons on or near him, it was reasonable for the officers to

---

[2] The Court recognizes the possibility that both parties are telling the truth—because of Plaintiff's positioning in the small trunk area, it is possible that Plaintiff attempted to show his right hand, but the officers could not see it. So, it is possible to take Plaintiff's assertion—that he raised both hands immediately—as true, while also crediting the defendants' consistent testimony that they could not see Plaintiff's right hand. In any event, the Court finds that this dispute is immaterial to the outcome.

perceive him as an immediate threat to their safety. And because Plaintiff was hiding in a small, enclosed area, potentially with weapons, Defendant Hastings reasonably decided to deploy Arlo. Defendant Hastings points out that Arlo could more easily fit into the opening to the trunk area and maneuver around in the small space. Moreover, deploying Arlo was safer than an officer attempting to crawl into a small, enclosed space with a violent, gang-affiliated felon who may be armed. As a result, the second *Graham* factor—whether Plaintiff posed an immediate threat to the safety of the officers or others—also weighs in favor of granting Defendants' motion.

The third *Graham* factor—whether Plaintiff actively resisted or attempted to evade arrest—is a somewhat closer call. Plaintiff hid from officers but did not attempt to flee. The videos show that Plaintiff was noncompliant with the officers' orders to come out and surrender, but the parties dispute whether Plaintiff's resistance was passive or active.

The only force at issue in this case is Arlo's bite. None of the defendants struck Plaintiff in any way or used more force than necessary to complete the arrest. The third *Graham* factor is important to the reasonableness of both the decision to deploy Arlo and the duration of Arlo's bite.

Plaintiff contends that he "immediately surrendered and put [his] hands in the air as directed as well as verbally surrendered" and that he "follow[ed] any and all directives like showing [his] hands, rolling on [his] stomach, and being handcuffed, all while police dog remained attached." Dkt. No. 104 at 1. The video evidence shows that Plaintiff put at least one of his hands in the air but blatantly contradicts his claim that he verbally surrendered or that he followed the other directions given to him. Plaintiff can be heard saying "okay, okay, okay" after Arlo bit him, but neither these words nor his actions indicated surrender.

The video establishes that he did not emerge from the vehicle on his own, despite repeated, shouted instructions to do so, nor did he roll over onto his stomach on his own.  Plaintiff's counsel argues that Defendants acted too hastily, did not negotiate enough, and did not give Plaintiff enough time to comply with their orders.  Dkt. No. 117-1.  But this argument ignores the repeated, loudly broadcast announcements and orders for Plaintiff's surrender for the hour before his arrest.  Once he was found, the officers could not determine whether Plaintiff was armed, and because of his criminal history and gang affiliation, he was reasonably presumed to be dangerous.  So, Plaintiff's continued noncompliance in these circumstances required quick resolution.

Defendants contend that Plaintiff's hiding from officers for approximately an hour, and his refusal to come out of his enclosed hiding space when found constitutes active resistance, especially when officers could not see the area around him.  *See Woodard v. Carol*, 630 F. Supp. 3d 806, 817–18 (W.D. La. Sept. 26, 2022) (finding that the plaintiff "'actively resisted' by hiding in tall, thick grass where his hands and surroundings could not clearly be seen and by failing to comply with orders, . . . [which] posed an 'immediate threat to the safety of the officers,'" so deploying a K9 was reasonable).  Likewise, the Fifth Circuit has characterized a suspect's resistance as "immediate and persistent," when the suspect refused to "turn around and give up his right arm" despite repeated commands, rendering the use of a taser objectively reasonable.  *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012).

Then, after Plaintiff was pulled from the vehicle, not only did he continue to disregard the officers' directions, but the video confirms that he kicked his legs at the officers.  Treharne BWC 0:18:12–15; Macias BWC 0:33:25–31.  This active resistance required Defendant Treharne to quickly move in to contain Plaintiff's legs.   Defendant

24

Hastings explains that it was important for Arlo to remain engaged and continue to bite Plaintiff for the short period of time—less than a minute—it took officers to fully subdue and handcuff Plaintiff. Dkt. No. 101 at 153. He asserts that the brief continuation of the bite permitted officers to restrain Plaintiff without using additional force and that releasing him was dangerous because they still did not know whether Plaintiff had any weapons. *Id.* Moreover, the videos confirm that Defendant Hastings released Arlo—and the dog stopped biting—immediately after Plaintiff's right arm was secured in a handcuff. The dog did not bite Plaintiff at any time after Plaintiff's handcuffing was complete.

Given these circumstances, Defendant Hastings' decision to deploy Arlo and not to release him until Plaintiff was secured was objectively reasonable. This is especially so in the context of an hour-long search and standoff with a hiding, barricaded suspect with multiple outstanding felony arrest warrants and a known violent criminal history and gang affiliation. Altogether, the *Graham* factors easily support Defendant Hastings's assertion of qualified immunity.

Finally, Plaintiff has failed to identify a case in which an officer acting under similar circumstances was held to have violated a plaintiff's rights, so he cannot overcome Defendant Hastings's qualified immunity defense. Plaintiff's counsel relies on *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016). Dkt. No. 117-1. In that case, the Fifth Circuit held that it was objectively unreasonable to allow a K9 to continue to bite a suspect who was "actively complying" with commands. There, the suspect had his hands on his head, visible to the officer, and he complied with an order to roll onto his stomach, so the Fifth Circuit found that no reasonable officer could believe that he was actively resisting arrest. But the circumstances here are easily distinguishable. Unlike the suspect in *Cooper,* the video

evidence here shows that Plaintiff refused to comply with nearly all of the officers' commands. Moreover, once he was extracted from his hiding place, he kicked his legs at the officers.

To the contrary, the Fifth Circuit has recently found it reasonable for officers to deploy a K9 in the context of a dangerous, hiding suspect. *Smith v. Lee*, 73 F.4th 376, 385 (5th Cir. 2023). And the Fifth Circuit has affirmed that the "measured and ascending" use of force—including the use of K9 force—is not excessive when a suspect is resisting arrest. *Shumpert v. City of Tupelo* (5th Cir. 2018) (explaining that K9 force was reasonable because Shumpert ignored the officer's instructions and retreated further into the crawl space under the home, preventing the officer from determining whether he was armed).

In short, Plaintiff has failed to demonstrate that Defendant Hastings's use of K9 force during his arrest violated his clearly established constitutional rights during his arrest. As a result, Defendant Hastings is entitled to qualified immunity.

### D.    Bystander Liability

Plaintiff also asserts that each of the other defendants is responsible for failing to intervene and stop the dog bite under a theory of bystander liability. In the Fifth Circuit, "an officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citing *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995)). In short, Courts must "consider whether an officer 'acquiesce[d] in" the alleged constitutional violation.'" *Id.* at 647.

A bystander-liability claim stemming from the use of excessive force turns on whether the bystander has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale*, 45 F.3d at 919. Mere presence at the scene of alleged use of excessive force, however, does not give rise to bystander liability. *See Whitley*, 726 F.3d at 646–47; *Vasquez v. Chacon*, No. 3:08-CV-2046-M, 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009) (citing *Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001), *aff'd* 390 F. App'x. 305, 2010 WL 3023273 (5th Cir. 2010)). Making this determination involves consideration of both the duration of the alleged use of force and the location of the detainee relative to the bystanders. *See generally Vasquez*, 2009 WL 2169017, at *6.

Because the Court already found that neither Defendant Hastings's deployment of the K9 nor the duration of Arlo's bite violated Plaintiff's constitutional rights during the brief struggle to arrest him, the bystander-liability analysis is simple. Plaintiff has not demonstrated the first required element—that any of the defendants realized that the force used by another officer was excessive—because the Court has found the force used by Hastings and Arlo to be reasonable under the circumstances. This alone defeats Plaintiff's bystander-liability claim. As described above, the scene of Plaintiff's arrest was tense and chaotic. Defendants Lidiak, Siegfried, Treharne, and Macias—all seasoned and experienced law enforcement professionals—each attested that they believed deploying Arlo was reasonable under the circumstances.

And the use of K9 force was brief. Arlo bit Plaintiff for about 30 seconds in the car and another 45 seconds after Plaintiff was removed from the car—less than one minute and 20 seconds altogether. Hastings BWC 1:02:07–1:03:25. During that time, Plaintiff did not

comply with any of the officers' orders.  He did not roll over onto his stomach as directed, so officers had to forcibly roll him.  He kicked his legs, requiring Defendant Treharne to contain them.  Once Plaintiff was subdued, Defendant Macias swiftly secured his right arm in a handcuff and the dog immediately released his bite.  Thus, the brevity of the use of force also weighs against any finding of bystander liability.

Moreover, the summary judgment records show, and Plaintiff does not refute, that Defendants Uptain, Jaramillo, and Delarosa were not even present in the garage during Plaintiff's arrest.  Thus, Plaintiff has failed to establish any of the elements required to find them liable as bystanders.

In short, Plaintiff has failed to show that Defendant Hastings used excessive force in deploying Arlo or that any defendant had a reasonable opportunity to realize that Arlo's deployment and bite was excessive and acquiesce to it.  Plaintiff has failed to overcome the defendants' assertions of qualified immunity, and the defendants are entitled to summary judgment on Plaintiff's bystander-liability claims.

## 6.    Conclusion

Defendants have asserted in good faith the defense of qualified immunity, and Plaintiff has failed to point to any evidence in the record to show that their actions violated his constitutional rights or that they were unreasonable in light of clearly established law. Because the video evidence blatantly contradicts most of Plaintiff's version of events, there remains no genuine dispute over the facts material to Defendants' motions.

For these reasons, the Court finds that Defendants' motion for summary judgment should be granted, that Plaintiff take nothing on his claims against Defendants, and that all remaining claims should be dismissed with prejudice.

All relief not expressly granted is denied, and any other pending motions are denied.

The Court will enter judgment accordingly.

Dated September 12, 2025.

James Wesley Hendrix
United States District Judge